## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

JOSEPH COVELL BROWN,

        Plaintiff,

v.                                                                                    ACTION NO.  2:19cv376

MARCUS PORTER, in his individual
capacity,
NORFOLK STATE UNIVERSITY,
THE BOARD OF VISITORS OF
NORFOLK STATE UNIVERSITY,
THE COMMONWEALTH OF
VIRGINIA, and
TRACCI K. JOHNSON, in her
individual capacity,

        Defendants.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

This matter comes before the Court on the motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim, filed by defendants Marcus Porter, Norfolk State University ("NSU"), the Board of Visitors of Norfolk State University, the Commonwealth of Virginia, and Tracci K. Johnson ("defendants"). ECF No. 4. The motion was referred to the undersigned United States Magistrate Judge on August 29, 2019, pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). ECF No. 13. For the reasons discussed below, the undersigned **RECOMMENDS** that the motion to dismiss count I for lack of subject matter jurisdiction be **GRANTED**, and the motion to dismiss for failure to state a claim be **GRANTED in part** and **DENIED in part**.

## I.   **PROCEDURAL HISTORY**

Joseph Covell Brown ("Brown") initially filed an action in the Circuit Court for the City of Norfolk on June 14, 2019, alleging five counts against defendants. *See generally Brown v. Porter et al.*, No. CL19-6091 (Va. Cir. Ct. June 14, 2019); ECF No. 1-3.  On July 18, 2019, defendants removed the case to federal court. ECF No. 1.  On July 25, 2019, defendants filed a motion to dismiss the complaint pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure with a supporting memorandum. ECF Nos. 4–5.  On August 12, 2019, Brown filed a memorandum in opposition to defendants' motion to dismiss. Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Mem."), ECF No. 9.  Defendants filed a reply on August 20, 2019. Defs.' Reply, ECF No. 12.

## II.   **FACTUAL BACKGROUND**[1]

Brown is a New Jersey resident and member of the Muslim faith. Compl. ¶¶ 6, 8, ECF No. 1-2.  From August 2014 through June 2017, Brown attended NSU. *Id.* at ¶ 7.  So that he could afford tuition, Brown accepted student loans, for which he remains responsible. *Id.* at ¶ 19.  NSU is a public university and receives federal funding. *Id.* at ¶ 11–12.  The Board of Visitors of NSU ("Board") is a corporation established pursuant to Virginia law. *Id.* at ¶ 14 (citing Va. Code Ann. §§ 23.1-1900–1902 (2016)).  The Board was formed in order to "establish[] and maintain[] the provisions and duties of NSU's teachers, staff and agents," and to "maintain[], operat[e] and direct[] the affairs of NSU." *Id.*  NSU published its disciplinary procedures online. *Id.* at ¶ 24.[2]

---

[1] The factual history detailed below is based on Brown's complaint, consistent with the standard of review detailed below.

[2] NSU's student conduct policies can be found at the following website: http://www.nsu.edu/student-affairs/student-judicial/student-conduct-process (last visited Nov. 26, 2019).

In 2015, NSU placed Brown on disciplinary probation for the 2016–2017 school year. *Id.* at ¶ 20. Brown's probationary period ended in May 2017. *Id.* at ¶ 21. In June 2017, Brown began finalizing paperwork which would allow him to participate in the study abroad program to which he had been accepted, during his senior year at NSU. *Id.* at ¶ 22. Also in June 2017, Brown was suffering from sciatica in his left hip and had difficulty walking. *Id.* at ¶ 23. On June 11, 2017, Brown and his roommate, Davonte' Smith ("Smith") were texting each other about the food and dirty dishes in their room. *Id.* at ¶¶ 25–26. During their conversation, Brown and Smith were physically present in their shared dorm room, either in the same room or adjoining rooms. *Id.* at ¶ 27. At some point in their conversation, Brown texted Smith, "Text me again and im [sic] breaking your jaw." *Id.* at ¶ 29. After receiving Brown's text, Smith sent another text message, and Brown did not break his roommate's jaw. *Id.* at ¶¶ 30–31. The evidence available to NSU officials indicated that "Smith considered the texting conversation to be playful in nature." *Id.* at ¶ 28.

On June 14, 2017 at 4:58 p.m., Marcus Porter ("Porter"), the Assistant Director of student conduct, emailed Brown notice of an alleged violation of NSU's Code of Student Conduct. *Id.* at ¶¶ 9–10, 32–33; Compl. Ex. 1. In the notice, Brown was instructed to vacate his dorm room within two hours—no later than 7:00 p.m.[3] Compl. ¶ 34. At the time the notice to vacate was sent to Brown's email address, Brown was working in an NSU administrative office and could not access the email. *Id.* at ¶ 36. Brown only received the notice to vacate after he finished working on June 14, 2017, after which he "barely managed to rush to his dormitory room and successfully vacate it within the cursory deadline." *Id.* at ¶ 37. As a result, Brown was forced to abandon many

---

[3] Brown was given "approximately one hundred and twenty-two minutes to receive the email, read it, pack all of his possessions, find alternative housing, arrange transportation and vacate his dormitory room." Compl. ¶ 35.

of his possessions, including the medication for the pain caused by his sciatica, and was unable to find transportation or alternate housing for the evening. *Id.* at ¶¶ 38–39. Because Brown was unable to arrange housing overnight, he spent the night in the waiting room of the NSU campus police station. *Id.* at ¶ 39.

On June 15, 2017 at 8:57 a.m., Porter emailed Brown a second notice letter "to schedule a meeting to discuss the investigation of a report . . . that [Brown] violate[d] section(s) of the Code of Student Conduct." *Id.* at ¶ 40. The second notice indicated that the meeting would take place at the NSU police station at 10:00 a.m on the same day. *Id.* at ¶ 41. With only sixty-three minutes from the time of the transmission of the email and the conduct conference, Brown did not see or read the notice emailed to him. *Id.* at ¶ 43.

When Porter arrived at the campus police station around 10:00 a.m, he and NSU campus police officers questioned Brown. *Id.* at ¶ 45. Porter acted as the "investigator, fact finder and decision maker." *Id.* at ¶ 61. During the questioning, Porter asked Brown whether he was Muslim, to which Brown affirmed he was. *Id.* at ¶ 46. There were apparently no other witnesses present at the conduct conference; nor were there any "counsel, support person or advisor" present to speak on Brown's behalf during the conference. *Id.* at ¶¶ 47–48. Additionally, Brown did not present any defenses at the conduct conference, and Porter did not explain any of the specific allegations and potential consequences Brown faced before or during the conduct conference. *Id.* at ¶¶ 49–50. Brown did not have a "reasonable opportunity to assess the accusations, formulate a defense, contact counsel, contact witnesses or otherwise prepare for a hearing." *Id.* at ¶ 51.

Following the conduct conference on June 15, 2017, Porter emailed Brown a "Resolution Letter," which informed Brown that he was being held responsible for a "violation of the Code of Student Conduct specifically, No. 20-Threatening Behavior (Probation Violation)." *Id.* at ¶ 52;

4

Compl. Ex. 3. The Resolution Letter informed Brown that he was being expelled from NSU. *Id.* at ¶ 53. Prior to receiving the Resolution Letter, Brown had not received any written notice that he was being charged with a probation violation, and that expulsion was a "likely" sanction. *Id.* at ¶¶ 54–55. According to NSU's published disciplinary procedures, conduct violations eligible for "expulsion, suspension and/or removal from housing" must be referred by the student conduct officer "to the Student Conduct Board for formal resolution through an administrative hearing." *Id.* at ¶ 56. Brown contends that he did not receive any of the additional procedural safeguards that should have been provided to him as a student accused of conduct punishable by expulsion. *Id.* at ¶ 58. Additionally, monies remaining in his student account were not withdrawn and returned to Brown before NSU shut down his student account. *Id.* at ¶ 96.

On June 22, 2017, Brown filed an "Appeal Form" with NSU. *Id.* at ¶ 64. He requested that the following issues be addressed on appeal: (1) "whether the conduct conference/hearing was conducted fairly and in conformity with prescribed procedures"; (2) whether consideration should be given to "new evidence unavailable during the original conduct conference/hearing"; and (3) "whether the sanctions imposed were disproportionate to the violation." *Id.* at ¶ 65. In his appeal, Brown alleged that a witness had been present during Brown and Smith's texting conversation on June 11, 2017. *Id.* at ¶ 66.

On June 28, 2017, defendant Tracci K. Johnson ("Johnson"), NSU's Dean of Students, replied to Brown with an "Appeal Response," which denied Brown's appeal, and indicated that the denial was "final." *Id.* at ¶¶ 16–17, 67–68. Attached to NSU's response was an "Appeal Response Rationale" in which NSU alleged the following: that on June 15, 2017,[4] NSU held an

---

[4] Even though Brown alleges he did not file his appeal until June 22, 2017, the appeal response rationale indicates that an appeal conference took place seven days earlier, on June 15, 2017. *See* Compl. ¶ 64; Compl. Ex. 5.

appeal conference; that Johnson was the "Appeal Officer" at the conference; and that Brown "attended the Appeal Conference via email." *Id.* at ¶ 69. Nothing in NSU's Rationale addressed "whether the conduct conference/hearing was conducted fairly and in conformity with prescribed procedures." *Id.* at ¶ 70. Further, NSU's rationale did not address "new evidence unavailable during the original conduct conference/hearing." *Id.* at ¶ 71. NSU's rationale concluded that expulsion was not disproportionate to the conduct at issue after referencing "prior conduct that was not at issue in the Notice sent by . . . Porter on June 15, 2017, as well as references to the language and content of . . . Brown's appeal letter." *Id.* at ¶ 72; *see id.* ¶ 54 (prior conduct involved a probation violation).

As a result of his expulsion, Brown has suffered humiliation and severe emotional distress. *Id.* at ¶ 77, 95 (alleging that, due to his expulsion, Brown suffers from "significant reputational injury, significant professional injury, losses in earnings, substantial losses to future earnings and benefits, significant pain and suffering, medical expenses, embarrassment, anguish and severe emotional distress.").

When he was unable to obtain his transcripts after multiple requests, Brown traveled from New Jersey to NSU to obtain his transcript on February 19, 2018. *Id.* at ¶ 81. Brown only made the trip from New Jersey to NSU because every attempt to obtain his transcript had failed.[5] *Id.* at ¶ 82. Upon Brown's arrival on campus, he first reported to NSU campus police to "announce his presence and purpose of visit." *Id.* at ¶ 84. After checking in, Brown went to the registrar's office to request his transcript. *Id.* at ¶ 85. While in the registrar's office, "multiple NSU Campus Police Officers appeared and publicly arrested" him. *Id.* at ¶ 86. Police officers handcuffed Brown and

---

[5] Brown does not state whether the alleged prior attempts to obtain his transcript were completed online or over the phone.

escorted him out of the registrar's office "in full view of several of his friends and former colleagues." *Id.* at ¶ 87. Brown alleges he was "humiliated, denigrated and defamed by [his arrest] and suffered severe emotional stress as a result." *Id.* at ¶ 88. NSU campus police transported Brown to the police station, where officers told Brown he was being charged with trespassing and would be "turned over" to the Norfolk Police Department. *Id.* at ¶ 89. Before transport, NSU campus police released Brown "after being made aware" by Brown and Brown's attorney that Brown had reported in at the NSU campus police station and had received permission to obtain his transcript from the registrar. *Id.* at ¶ 92. Because he was shaken up and embarrassed by his public arrest, Brown left campus without obtaining his transcript. *Id.* at ¶ 93.

The complaint contains five counts. Count I alleges that the Commonwealth of Virginia, NSU, the Board, Johnson, and Porter, violated Brown's due process rights under the United States and Virginia Constitutions, by failing to adhere to the published disciplinary procedures in the student handbook. *Id.* at ¶¶ 97–115. Count II alleges that defendants Porter and Johnson violated Brown's right to free speech under the United States and Virginia Constitutions by basing the decision to expel Brown and deny his appeal on his constitutionally-protected speech. *Id.* at ¶¶ 116–23. Count III alleges that the Commonwealth of Virginia, NSU, and the Board discriminated against Brown based on his gender, in violation of Title IX, by expelling him when they had not historically expelled female students for similar conduct. *Id.* at ¶¶ 124–34. Count IV alleges that the Commonwealth of Virginia, NSU, and the Board, by inquiring as to whether Brown practiced the Muslim faith, committed an act of religious discrimination based partially on gender in violation of Title IX. *Id.* at ¶¶ 135–42. Lastly, count V alleges that NSU and the Board breached Brown's contractual rights, established by NSU's published disciplinary procedures, during its investigation and expulsion of Brown. *Id.* at ¶¶ 143–52.

### III.   ANALYSIS

**A.**   **Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction where a party is entitled to immunity.**

Defendants moved to dismiss Brown's action on the basis of Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 4.  In response to Brown's due process claim (count I), defendants moved for dismissal for lack of subject matter jurisdiction on the grounds of immunity.  Defs.' Mem. at 6–7, 9.  *See Cunningham v. Gen. Dynamics. Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018); *see also John Doe v. Bd. of Trs. of St. Mary's Coll. of Md.*, No. CBD-19-1760, 2019 WL 6215543, at *6 (D. Md. Nov. 20, 2019) (quoting *Cunningham*, 888 F.3d at 649) ("[S]overeign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject [] matter jurisdiction."); *Drewrey v. Portsmouth City Sch. Bd.*, 264 F. Supp. 3d 724, 727 (E.D. Va. 2017) (nothing the Eleventh Amendment "inhibit[s] the exercise" of a court's subject matter jurisdiction) (citation and internal quotation marks omitted).  Therefore, "if the Eleventh Amendment or sovereign immunity applies, this court should grant the Motion to Dismiss for lack of subject matter jurisdiction." *Id.*

**B.**   **The standard of review for Rule 12(b)(6) motion to dismiss.**

Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Rule 12(b)(6) provides for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion tests the legal sufficiency of a complaint; it does "not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

8

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While plausibility "is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When reviewing a motion to dismiss, the Court must "assume all [well-pled facts] to be true" and "draw all reasonable inferences in favor of the plaintiff," but it "need not accept the legal conclusions drawn from the facts, and [] need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citations and internal quotation marks omitted); *see also Twombly*, 550 U.S. at 555 (noting that the court is "not bound to accept as true a legal conclusion couched as a factual allegation"). Accordingly, the Court may only grant a 12(b)(6) motion if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of [the] claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 677–78. "[N]aked assertion[s] devoid of further factual enhancement" are not sufficient under *Iqbal's* "plausibility" standard. *Id.* at 678; *see also Nemet*, 591 F.3d at 255 (same). Without the "heft" of sufficient facts to support his claims, "plaintiff[] . . . cannot establish a valid entitlement to relief, as facts that are 'merely consistent with a defendant's

liability,' fail to nudge claims 'across the line from conceivable to plausible.'" *Nemet*, 591 F.3d at

256 (internal citations omitted) (quoting *Iqbal*, 556 U.S. at 674, 680).

Additionally, when considering a motion to dismiss for failure to state a claim, a court may

only consider the pleadings, which include "documents attached as exhibits or incorporated by

reference." *Carrington v. HSBC Bank USA, N.A.*, 760 F. Supp. 2d 589, 592 (E.D. Va. 2010); *see*

*also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) ("[O]ur evaluation

is . . . generally limited to a review of the allegations of the complaint itself."). Supporting

memoranda are not part of the pleadings. *See Dawson v. Winter*, No. CCB–06–2885, 2007 WL

1610905, at *2 (D. Md. May 21, 2007) (holding that a motion and memorandum are not pleadings).

## C.    Count I against defendants sufficiently states a claim for a due process deprivation of a liberty interest.

The Due Process Clause of the Fourteenth Amendment of the United States Constitution

guarantees that a state will not "deprive any person of life, liberty, or property, without due process

of law." U.S. Const. amend. XIV, § 1. The Due Process Clause contains both a substantive and

procedural component. *Id.* The procedural component of the Due Process Clause prohibits states

from taking actions that deprive citizens of "liberty" or "property" interests. *See Mathews v.*

*Eldridge*, 424 U.S. 319, 332 (1976). To properly state a procedural due process claim, Brown

must show the following: (1) "that he possessed a protected liberty or property interest"; (2) "that

the state or its agents deprived him of this interest"; and (3) "that this deprivation was effectuated

without constitutionally sufficient process." *Doe v. Rector and Visitors of George Mason Univ.*,

132 F. Supp. 3d 712, 719 (E.D. Va. 2015); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 577

(1972).

The complaint directly alleges the second element, stating that defendants are either "the

state or its agents." *See* Compl. ¶¶ 100–102, 104, 109, 113. Accordingly, the Court need only

10

address the first and third elements of Brown's procedural due process claim.

As discussed below, Brown fails to sufficiently allege a property interest. He does, however, properly allege deprivation of a liberty interest.

**1.    Brown has failed to sufficiently allege a property interest.**

To have a protected property interest, Brown must allege an interest that is "created or defined" by a source independent from the Fourteenth Amendment itself. *GMU*, 132 F. Supp. 3d at 719 (citing *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011)). One independent source stems from state law. *Roth*, 408 U.S. at 577. As the Supreme Court held in *Roth*, "[t]o have a property interest in a benefit, a person clearly must have more than . . . a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.*; *see also Tri-County Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 436 (4th Cir. 2002) (citing *Roth*, 408 U.S. at 577).

As explained in *GMU*, the Supreme Court held in *Goss v. Lopez* that

> a student's enrollment in a public school constituted a property interest based on an Ohio statute[] guaranteeing a free education to all residents between 5 and 21 years of age, which created that entitlement. In other words, the plaintiff in *Goss* was able to locate a state law source of a qualifying property interest, namely a statutory claim of entitlement to continued enrollment in public school.

*GMU*, 132 F. Supp. 3d at 720 (citing *Goss v. Lopez*, 419 U.S. 565, 573–74 (1975)). Similarly, the Virginia Constitution guarantees a "system of free public elementary and secondary schools for all children of school age throughout the Commonwealth." Va. Const. art. VIII, § 1. However, the Virginia Constitution is silent on the rights of students seeking post-secondary education, and "[n]either the Supreme Court nor the Fourth Circuit has held that such a property interest exists in connection with higher education, either categorically or specifically with regard to Virginia law."

*GMU*, 132 F. Supp. 3d at 720–21.

Neither the complaint nor the exhibits attached thereto identify the source of any property interest in Brown's education and continued enrollment in NSU. *See, e.g.*, *Goines*, 822 F.3d at 165–66. While Brown includes in his memorandum in opposition to defendants' motion to dismiss a Virginia statute which he contends gives rise to a property interest in his post-secondary education, Brown failed to mention this statute in his complaint.[6]

For the reasons stated above, Brown has not alleged a property interest.

**2.      Brown has sufficiently alleged a liberty interest.**

Even though Brown did not properly allege a property interest, the Court may still find that Brown's due process claim survives defendants' motion to dismiss—but only if "he can allege and prove that his expulsion from [NSU] deprived him of, or injured, a qualifying liberty interest." *GMU*, 132 F. Supp. 3d at 721; *see, e.g.*, *Roth*, 408 U.S. at 569–70.

In the context of due process, a liberty interest "encompasses more than 'mere [] freedom from bodily restraint.'" *GMU*, 132 F. Supp. 3d at 721 (quoting *Roth*, 408 U.S. at 572). Instead,

---

[6] Brown cites to Virginia Code § 23.1-600(A) (2016), which provides for participation in and eligibility for state-supported financial aid programs. Under section 23.1-600(A), "[p]articipation in and eligibility for state-supported financial aid or other higher education programs designed to promote greater racial diversity in public institutions of higher education shall not be restricted on the basis of race or ethnic origin. Any individual who is a member of any federally recognized minority is eligible for and may participate in such programs if such individual meets all other qualifications for admission to the relevant institution and the specific program." Va. Code Ann. § 23.1-600(A). Brown argues that, as an African-American at an historically black college, he was entitled to "certain grants and programs pursuant to the Virginia Code and the Higher Education Act of 1965 that are designed to promote greater racial diversity." Pl.'s Mem. at 8 (citing 20 U.S.C. §§ 1001–1019). However, any right to participate in financial aid programs does not create a property right to attend post-secondary education. *See Runge v. Barton*, No. 6:08-0231-GRA, 2009 WL 3245471, at * 7 (D.S.C. Oct. 2, 2009) ("[T]he plaintiff has not established that his children[, students at a South Carolina college,] possessed a protected property right in receiving financial aid."). Accordingly, even if Brown's complaint identified Virginia Code § 23.1-600(A) as a source, the Virginia Code would not entitle him to continued post-secondary education at NSU.

the Supreme Court has held that a liberty interest is implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). As applied in school discipline cases, such as *Goss v. Lopez*, the Supreme Court affirmed that students' liberty interests may be implicated when the students were suspended or expelled due to allegations of misconduct. *Goss*, 419 U.S. at 575. "[C]harges of misconduct," the Court ruled, "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *GMU*, 132 F. Supp. 3d at 721 (citing to *Goss*, 419 U.S. at 575).

But a student must show more than "injury to reputation alone." *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 628 (4th Cir. 2002). Therefore, "to state a procedural due process liberty interest claim, a plaintiff claiming due process protection must assert that a state actor has injured his reputation or otherwise imposed a reputational 'stigma' on him and must also have [deprived him] of 'some more tangible interests.'" *GMU*, 132 F. Supp. 3d at 722 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). The standard in *Davis* has been dubbed the "stigma-plus" test, and it mandates that plaintiffs like Brown, who assert a "reputational liberty interest protected by the Fourteenth Amendment," must show both "(i) the infliction by state officials of a 'stigma' to plaintiff's reputation *and* (ii) the deprivation of a legal right or status." *GMU*, 132 F. Supp. 3d at 722 (quoting *Davis*, 424 U.S. at 710–11).

In *GMU*, this Court applied the stigma-plus test in the context of a plaintiff alleging a protected liberty interest following expulsion from a public university. *Id.* at 724. The Court found that plaintiff met the first factor of the *Davis* stigma-plus test by explicitly alleging that he "'had a constitutionally protected liberty interest in his good name, reputation, honor, and

13

integrity' and 'in pursuing his education, as well as future educational and employment opportunities.'" *Id.* at 719. In addressing the second *Davis* factor—deprivation of a legal right or status—the *GMU* Court analogized a student's expulsion to cases pertaining to a public employee's discharge, in which the Fourth Circuit has long recognized "that a liberty interest is implicated by the public announcement of reasons for an employee's discharge." *Id.* at 723 (citing *Boston v. Webb*, 783 F.2d 1163, 1166 (4th Cir. 1986)) (explaining that the consequences of publicly announcing an employee's termination are reputational harm to "one's name" and difficulty "pursuing . . . employment" in "one's chosen field"). To that end, the Court held that "expulsion from a public school clearly constitutes the sort of deprivation or change in legal status actionable under the stigma-plus test." *Id.* at 722 (citation and internal quotation marks omitted). The Court in *GMU* reasoned that expulsion from a public school and misconduct "charges could seriously damage . . . students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Id.* (quoting *Goss*, 419 U.S. at 575). Finding that the plaintiff in *GMU* alleged, among other things, that his expulsion would "remain a part of Plaintiff's permanent educational records and [would] substantially limit his ability to transfer . . . , attend graduate school, or secure future employment," the Court ruled that plaintiff had stated a claim and adequately alleged it was likely that "prospective employers or members of the public would see the damaging information." *Id.* at 723.

In this case, Brown has met the second *Davis* factor, in that defendants expelled him from NSU. Compl. ¶ 53, Compl. Ex. 3. Brown has also met the first *Davis* factor. While Brown's due process claim does not explicitly allege deprivation of a liberty interest, the complaint alleges: "NSU's expulsion of Brown has permanently tarnished his academic record, potentially closing the door on numerous career and educational opportunities, and reducing his future earnings

14

potential. . . . Defendants' expulsion of Brown has caused and continues to cause Brown significant reputational injury, significant professional injury, losses in earnings, substantial losses to future earnings and benefits, significant pain and suffering, medical expenses, embarrassment, anguish and severe emotional distress." Compl. ¶¶ 78, 95, 97–115. Viewing the facts, as the Court must, in the light most favorable to Brown, the Court concludes Brown has sufficiently alleged deprivation of a liberty interest.

### 3.    Brown has alleged a constitutionally-inadequate process.

The Court must next determine whether Brown has alleged a constitutionally inadequate process. *See, e.g., Doe v. Alger*, 175 F. Supp. 3d 646, 656 (W.D. Va. 2016) ("If one or both [property and liberty interests] has been sufficiently alleged, then the court must determine whether the plaintiff has sufficiently alleged that the process he received was constitutionally inadequate.").

In an academic setting, the Supreme Court "has recognized that the requirements of due process may be satisfied by something less than a trial-like proceeding." *Henson v. Honor Comm. of the Univ. of Va.*, 719 F.2d 69, 74 (4th Cir. 1983) (citing *Goss*, 419 U.S. at 583). Schools are "not a courtroom or administrative hearing room." *Bd. of Curators v. Horowitz*, 435 U.S. 78, 88 (1978). As such, "judicial intrusion into academic decisionmaking should be avoided," because schools need greater "flexibility in fulfilling the dictates of due process." *Henson*, 719 F.2d at 74. Although more flexible in the school context, due process requirements for disciplinary proceedings, as opposed to academic evaluations, "require more stringent procedural protection," but still do not require "complete adherence to the judicial model of decisionmaking." *Id.* (citing *Goss*, 419 U.S. at 582); *see also Brown v. Rectors and Visitors of the Univ. of Va.*, 361 F. App'x 531, 532–33 (4th Cir. 2010) (quoting *Henson*, 719 F.2d at 74) ("Procedural requirements are greatly reduced, however, when a student is dismissed for academic, as opposed to disciplinary,

15

reasons.").

In determining the due process requirements for school disciplinary hearings, the Fourth

Circuit follows the standards established by the Fifth Circuit in *Dixon v. Ala. State Bd. of Educ.*,

294 F.2d 150 (5th Cir. 1961). *See Henson*, 719 F.2d at 74. In *Dixon*, the Alabama state board of

education expelled nine students for participating in civil rights demonstrations. 294 F.2d at 151–

53. The district court upheld the board's decision to expel the students, reasoning it was the

college's right "to dismiss students at any time for any reason without divulging its reason other

than its being for the general benefit of the institution." *Dixon v. Ala. State Bd. of Educ.*, 186 F.

Supp. 945, 951 (M.D. Ala. 1960). Finding the college expelled the students without providing

them due process—or any "rudimentary elements of fair play"—the Fifth Circuit reversed the

district court's decision and established the minimum due process requirements for disciplinary

matters in the school context:

> The notice should contain a statement of the *specific* charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. . . . By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. . . . the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present to the Board, or at least to an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses [o]n his behalf. If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the student's inspection.

*Dixon*, 294 F.2d at 158–60 (emphasis added).

In *Henson*, a student of the University of Virginia School of Law was expelled for both academic deficiencies and honor code violations. *Henson*, 719 F.2d at 70–71. Henson contended that the university's honor code procedures denied students due process in two ways: (1) the university deprived the student "the right to have experienced legal counsel conduct his defense and cross-examine witnesses"; and (2) the university denied the student "the right to have [his disciplinary] hearing subject to the traditional rules of evidence." *Id.* at 73. The Fourth Circuit found that the "procedural protections afforded [plaintiff] were sufficient under the fourteenth amendment's due process clause." *Id.* More specifically, the court held that plaintiff had been afforded an "impressive array of procedural protections"—he had a hearing before a committee of his peers, and given "adequate notice of the charges against him and the opportunity to be heard by disinterested parties." *Id.* at 71, 74. His accusers were required to "face the student at the hearing and state the basis of their allegations," and "submit to cross-examination by the student, or his designated student counsel, and by the members of the hearing committee." *Id.* at 73. Plaintiff was also "provided with two student-lawyers who consulted extensively with his personally retained attorney at all critical stages of the proceedings." *Id.* at 74. Lastly, plaintiff had considerable time to prepare for his hearing and appeal; "The time []lapse between notification and hearing was several months, and then several more months before a second hearing, then a little over a year of appeals before the matter was dropped." *Id.* at 71.

In comparison to the process described in *Henson*, the process relating to Brown's disciplinary hearing appears far less thorough. Brown was not tried in front of a committee; instead, he was tried by Porter, who acted as the sole "investigator, fact finder and decision maker." Compl. ¶ 61. Brown alleges he was not given "adequate notice of the charges against him," *Henson*, 719 F.2d at 74; rather, Brown received an email less than 24 hours before his conduct

conference, which vaguely noted that Brown "violated the Code of Student Conduct, specifically, No. 20.[,] [t]hreatening [b]ehavior[,] whether written or verbal, towards any member of the University community that causes an expectation of injury or implies a threat to cause fear." Compl. Ex. 1; *see also* Pl.'s Mem. at 11 ("Of note, the student in *Henson* was notified specifically of what he was accused of doing, and where he was accused of doing it."). Brown alleges that he did not believe the text exchange he had with Smith on June 11, 2017 was "threatening." Compl. ¶ 28. In fact, Brown contends that the "texting conversation . . . [was] playful in nature." *Id.* As such, the notice Brown received from NSU was vague—it did not identify the "*specific*" misconduct for which Brown was being investigated. *See Dixon*, 294 F.2d at 158. Brown also alleges that defendants never gave him notice that expulsion "was a likely sanction." Compl. ¶¶ 53–55.

Additionally, unlike the plaintiff in *Henson*, 719 F.2d at 71, who had "several months" to prepare for his disciplinary hearing, Brown had a "sixty-three[-]minute interval" between defendants' email scheduling a disciplinary hearing, and the actual conduct conference. Compl. ¶ 43. Under such time constraints, Brown contends that he "was not afforded a reasonable opportunity to assess the accusations, formulate a defense, contact counsel, contact witnesses or otherwise prepare for a hearing." *Id.* at ¶ 51; *see* Pl.'s Mem. at 13 (without sufficient time to prepare, Brown was "rendered utterly incapable of investigating, questioning witnesses, scheduling witnesses, or preparing a defense."). Moreover, at the conference, Brown was not able to confront his accuser, Smith, and therefore could not cross-examine him, as the plaintiff did in *Henson*, 719 F.2d at 73. The letter Brown received from defendants merely referenced the online source at which the code of student conduct could be found, which Brown argues did not adequately inform him of his rights at the disciplinary hearing, another requirement established by

the *Dixon* court. *See* Compl. Ex. 1; *see also Dixon*, 294 F.2d at 158.

*Dixon* indicates that a student accused of misconduct should receive some form of a written or oral report from his accuser, 294 F.2d at 159, but Brown was not presented with any reports to supplement his understanding of the charges against him. Compl. ¶ 73–76 (alleging that NSU did not provide Brown with a "Complainant's statement" or "Investigative Rationale" until Brown's counsel submitted an attorney request for documents almost a year following the incidents at issue in this case). Following the conduct conference, defendants did not provide Brown with an investigation report explaining the charges against him, evidence considered, or rationale for defendants' decision to expel him. *Id.* Brown alleges that, when defendants sent the resolution letter informing Brown he was being expelled, defendants considered conduct outside of and unrelated to the conduct for which he was being investigated. Compl. ¶¶ 52, 54 ("Until receipt of the Resolution Letter, Brown had received no written notice that he was being charged with [a] probation violation."). Finally, when Brown filed his appeal, he contends that defendants failed to respond to each of his grounds for appeal, and based their decision to deny the appeal on "conduct that was not at issue in the Notice sent by Defendant Porter on June 15, 2017, as well as references to the language and content of Plaintiff Brown's appeal letter." *Id.* at ¶ 72.

Brown's allegations indicate that defendants strayed from the code, and from *Dixon's* requirements for due process in the school discipline context, and denied him many of the rights to which he was entitled as a student accused of misconduct.[7] 294 F.2d at 158–59. Accepting

---

[7] NSU's Student Handbook contains a section titled, "Student Conduct Process," which outlines disciplinary procedures for both a formal and informal investigation, notification, and conference for allegations of misconduct. *See* Compl. Ex. 6, ECF No. 1-2 at 27–35. Under the formal resolution section of the Student Conduct Process, Brown arguably should have received a notice, in writing, which included, "[t]he reported violation(s) citing the *Code of Student Conduct*," "[t]he date, time, and location of the hearing," and "[t]he rights of the respondent [student]." *Id.* After receiving notice, a student will attend a disciplinary hearing which is ordinarily run by a student

Brown's allegations as true, and viewing them in the light most favorable to him, *Nemet*, 591 F.3d at 253, Brown has alleged a constitutionally inadequate process.

For these reasons, Brown has sufficiently pled the elements of his due process claim (count I). However, as discussed below, because defendants are entitled to immunity, count I should be dismissed for lack of subject matter jurisdiction, so the Court **RECOMMENDS** that Brown's due process claim (count I), be **DISMISSED with prejudice.**

**D.   Count I's due process claims against the Commonwealth, NSU, and the Board are barred by Eleventh Amendment immunity, and count I's due process claims against NSU, and the Board are also barred by sovereign immunity.**

Count I alleges all defendants violated Brown's due process rights arising under the United States Constitution and the Virginia Constitution, as described above.[8] Brown alleges that NSU is a government-funded university. Compl. ¶¶ 11–12. As a "public institution of higher education," NSU is an instrumentality of the Commonwealth of Virginia. Va. Code Ann. § 23.1-100; *see also Demuren v. Old Dominion Univ.*, 33 F. Supp. 2d 469, 475 (E.D. Va. 1999) (finding "state colleges and universities are agents of the state, and thus immune from suit under the Eleventh Amendment"). Brown contends that "[s]tate sponsored universities, like NSU, owe a

---

conduct panel, but which may not be available during summer sessions. *Id.* In the event a student conduct panel is not possible, a student conduct officer will oversee the hearing. *Id.* at 31. At the hearing, the parties have "the privilege of questioning witnesses," and the officer may only consider "oral and written statements of witnesses and written reports/documents." *Id.* at 30. After the officer renders his or her decision, the student has the right to electronically submit an appeal, which the dean of students must review and "provide a written decision within five (5) business days. . . . [T]he decision is made based on the written information submitted and is final." *Id.* at 31.

[8]"The Due Process Clauses of the United States Constitution are co-extensive with those in the Virginia Constitution." *Brown v. Transurban USA, Inc.*, 144 F. Supp. 3d 809, 841 n.19 (E.D. Va. 2015); *see also Shivaee v. Commonwealth*, 613 S.E.2d 570, 574 (Va. 2005). Therefore, rather than analyzing them independently, the Court will consider them as part of the same analysis.

duty to students to establish rules and regulations governing disciplinary proceedings in such a way that Constitutional Rights are preserved." *Id.* at ¶ 102.

Brown also alleges that the Commonwealth of Virginia "owes a duty to students to oversee state sponsored universities, like NSU, and ensure that disciplinary procedures provide sufficient due process." Compl. ¶ 104. Where, as here, those procedures allegedly fall below the minimum level required by due process, Brown asserts the Commonwealth of Virginia is "likewise responsible" and liable. *Id.* at ¶ 113.

Defendants NSU, the Commonwealth, and the Board claim that sovereign immunity bars Brown's due process claims against them in count I. Defs.' Mem. at 6–7. As their memorandum seems to conflate sovereign immunity with immunity under the Eleventh Amendment, the Court will address both. *See Stewart v. North Carolina*, 393 F.3d 484, 487 (4th Cir. 2005) (holding that Eleventh Amendment immunity and the state common law doctrine of sovereign immunity are "related but not identical concepts").

In *Alden v. Maine*, the Supreme Court elucidated the difference between Eleventh Amendment immunity and common law sovereign immunity:

> We have . . . sometimes referred to the States' immunity from suit as "Eleventh Amendment immunity." The phrase is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment. Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States).

527 U.S. 706, 713 (1999). "In that sense, state sovereign immunity was not created by the Eleventh Amendment, but rather predated it." *Stewart*, 393 F.3d at 488. As such, Eleventh Amendment

21

immunity is only one "example of state sovereign immunity as it applies to suits filed in federal court against unconsenting states." *Id.* Therefore, even when a state has waived its Eleventh Amendment immunity, it has not necessarily waived its broader, state sovereign immunity.

The Commonwealth of Virginia, NSU, and the Board contend they are collectively entitled to Eleventh Amendment immunity and that, therefore, Brown's due process claim in count I should be dismissed for lack of subject matter jurisdiction. Defs.' Mem. at 6–7.

The Eleventh Amendment may be analyzed within the context of a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *See Cunningham v. Gen. Dynamics. Info. Tech., Inc.*, 888 F.3d at 649. In *Will v. Mich. Dept. of State Police*, the Supreme Court held that, while "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, . . . it does not provide a federal forum for litigants who seek a remedy against" a state or state agency. 491 U.S. 58, 66 (1989). The Eleventh Amendment bars these kinds of suits against a state or state agency "unless the State has waived its immunity," or "unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity."[9]  *Id.* (internal citations omitted); *see also Demuren*, 33 F. Supp. 2d at 475 ("[S]tate colleges and universities are agents of the state, and thus immune from suit under the Eleventh Amendment.").

To overcome the Eleventh Amendment immunity of the Commonwealth of Virginia, NSU, and the Board, Brown contends the following:  (1) by removing the case to federal court, the Commonwealth, NSU, and the Board have waived their Eleventh Amendment immunity; and (2) under the Virginia Tort Claims Act ("VTCA"), the Commonwealth of Virginia has waived its common law sovereign immunity in state court, and thereby consented to suit in federal court.

---

[9] Similarly, under *Will*, for purposes of section 1983, the Commonwealth of Virginia is not a suable "person." *Will*, 491 U.S. at 64 ("[A] State is not a person within the meaning of § 1983.").

Addressing his removal argument, Brown cites to *Lapides v. Board of Regents*, in which the Supreme Court ruled, a "State's action joining the remov[al] of [a] case to federal court waive[s] its Eleventh Amendment immunity." 535 U.S. 613, 624 (2002). In *Stewart*, however, the Fourth Circuit ruled that *Lapides* does not extend as far as Brown contends. *Stewart*, 393 F.3d at 490. The Fourth Circuit ruled that removal from state to federal court only waives Eleventh Amendment immunity when the state or state agency has already waived its immunity in state court. *Id.*; *see also Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019) ("a state retains its sovereign immunity from suit in state court, it does not lose that immunity by removing the case to federal court."). A state or its agency may waive its sovereign immunity in state court by "express constitutional or statutory waiver." *Gray v. Va. Sec'y of Trans.*, 662 S.E.2d 66, 71 (Va. 2008).

Brown contends that the VTCA operates as just such a waiver of immunity in state court and that, by removing this case to federal court, the Commonwealth, NSU, and the Board have thereby waived their Eleventh Amendment immunity.[10] *See* Pl.'s Mem. at 3–4. However, decisions from both the Fourth Circuit and district courts in the Fourth Circuit have rejected this argument as it concerns the Commonwealth of Virginia. *See e.g.*, *McConnell v. Adams*, 829 F.2d 1319, 1329 (4th Cir. 1987); *Haley v. Va. Dep't of Health*, No. 4:12cv16, 2012 WL 5494306, at *5 (W.D. Va. Nov. 13, 2012). In *McConnell*, the Fourth Circuit held that, while the VTCA generally "waiv[es] sovereign immunity for tort claims filed in state courts," it "does not waive the state's

---

[10] *See* Va. Code Ann. § 8.01-195.3 (2007) ("[T]he Commonwealth shall be liable for claims for money only accruing on or after July 1, 1982 . . . on account of damage to or loss of property or personal injury . . . caused by the negligent or wrongful act or omission of any employee while acting within the scope of his employment under such circumstances where the Commonwealth . . . if a private person, would be liable to the claimant for such damage, loss, injury or death.").

eleventh amendment immunity." *McConnell*, 829 F.2d at 1329 (citing *Reynolds v. Sheriff, City of Richmond*, 574 F. Supp. 90, 91 (E.D. Va. 1983)). More recently in 2012, the *Haley* court reiterated this point, explaining, "it is well settled that the VTCA does not waive Virginia's Eleventh Amendment immunity." 2012 WL 5494306, at *5; *see also Calloway v. Commonwealth*, No. 5:16cv81, 2017 WL 4171393, at * 6 (W.D. Va. Sept. 20, 2017) ("[A]lthough the Commonwealth enacted the Virginia Tort Claims Act . . . and allowed itself to be sued for negligence claims filed in state courts, it has not waived its Eleventh Amendment immunity and has not consented to be sued in *federal* courts.") (internal citations omitted). As the *Haley* court reasoned, the VTCA "does not refer to the Eleventh Amendment, does not mention suits in federal court, and does not appear to even contemplate this type of action." 2012 WL 5494306, at *5.

Therefore, the Commonwealth of Virginia, NSU, and the Board's motion to dismiss count I for lack of subject matter jurisdiction should be **GRANTED** as these three defendants are immune from suit on Brown's due process claim pursuant to the Eleventh Amendment.[11] *See Drewrey*, 264 F. Supp. 3d at 727; *see also St. Mary's*, 2019 WL 6215543, at *6.

---

[11] Even if the Eleventh Amendment did not apply to NSU and the Board, those two defendants would still be immune from Brown's due process claim in count I based upon the common law doctrine of sovereign immunity. *See Rector and Visitors of the Univ. of Va. v. Carter*, 591 S.E.2d 76, 78 (Va. 2004) (holding that the VTCA's waiver of sovereign immunity as to the Commonwealth "does not disturb the sovereign immunity of the Commonwealth's agencies"); *Michael v. Va. Commonwealth Univ.*, No. 3:18cv125-JAG, 2019 WL 128236, at *5 (E.D. Va. Jan. 8, 2019) ("While the [VTCA] provides a limited waiver of sovereign immunity in suits against the Commonwealth, that waiver does not apply to agencies like VCU."). NSU and the Board's sovereign immunity cannot be waived by the VTCA. Because the Court finds that the Commonwealth of Virginia is shielded by Eleventh Amendment immunity, it need not address whether the Commonwealth is also protected by sovereign immunity.

**E.**     **The due process claims against defendants Porter and Johnson in their individual capacities are barred by qualified immunity.**[12]

Count I also asserts a due process claim against Porter and Johnson in their individual capacities as school officials. Compl. ¶¶ 109–11. Government officials sued in their individual or personal capacities may be entitled to qualified immunity. *See, e.g., Lane v. Franks*, 573 U.S. 228, 243 (2014). When government officials perform "discretionary functions," they are entitled to qualified immunity from liability for any civil damages—but only to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998). "[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Wilson*, 141 F.3d at 114. In this way, if "the contours of the constitutional right asserted are not sufficiently clear, the defending state actor has an absolute defense of qualified immunity." *See Herron v. Va. Com. Univ.*, 366 F. Supp. 2d 355, 361 (E.D. Va. 2004). Furthermore, "even if a clearly-established constitutional right is implicated, a defense of qualified immunity may still apply if it was objectively reasonable for the state actor to believe that the conduct was lawful under the circumstances." *Id.* The burden of establishing entitlement to qualified immunity rests upon a defendant who invokes it. *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007).

Traditionally, the qualified immunity analysis requires two separate determinations. *See, e.g., GMU*, 132 F. Supp. 3d at 724. First, a court must determine, "whether, viewed in the light most favorable to the plaintiff, the defendant violated the constitutional rights of the plaintiff."

---

[12] In the memorandum in support of their motion to dismiss, defendants argue that Porter and Johnson should be immune from suit in their official capacities. *See* Defs.' Mem. at 7–8. But Brown's complaint only names Porter and Johnson in their individual capacities, and Brown reiterates in his memorandum in opposition to defendants' motion to dismiss that he is not asserting a due process claim against Porter and Johnson in their official capacities. *See* Pl.'s Mem. at 5–6.

*Wood v. Bd. of Educ. of Charles County*, No. GJH-16-00239, 2016 WL 8669913, at *6 (D. Md. Sept. 30, 2016). The second step in the qualified immunity analysis requires a court, if it finds a constitutional right has been violated, to consider "whether that right was clearly established, such that a reasonable official would understand what he [or she] is doing violates that right." *Id.* (quoting *Cole v. Buchanan Cty. Sch. Bd.*, 328 F. App'x 204, 208 (4th Cir. 2009)) (internal citations omitted).[13] For both determinations, the court must "identify[] the right at issue at the appropriate level of generality." *GMU*, 132 F. Supp. 3d at 724.

For a right to be "clearly established," some "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Brickey v. Hall*, 828 F.3d 298, 303 (4th Cir. 2016). Further, to determine whether the right was "clearly established at the time of the defendant[s'] alleged conduct," the focus is "not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Zepp v. Rehrmann*, 79 F.3d 381, 385 (4th Cir. 1996) (citing *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992)). The right must also be clearly established "at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If, at the time of the government officials' alleged misconduct, the federal right claimed by the plaintiff was not clearly established, the officials are entitled to qualified immunity. *GMU*, 132 F. Supp. 3d at 724.

---

[13] The Supreme Court has since abandoned the "rigid two-tiered approach," *Cole*, 328 F. App'x at 207, finding that "fixed adherence to the two-step inquiry" may result in depleting scarce judicial resources. *Wood*, 2016 WL 8669913, at *6 (citing *Pearson v. Callahan*, 555 U.S. 223, 224 (2009)). Instead, courts may "grant qualified immunity without first deciding whether a [constitutional] violation occurred so long as the right claimed to be violated was not clearly established." *Cole*, 328 F. App'x at 207.

In this case, the "appropriate level of generality" is not "that the government must afford due process when it deprives someone of liberty"—that would be far too general. *Id.* at 724–25. Instead, the "appropriate level of generality" is "the right to be free from a state college, university, or post-secondary educational institution expulsion for misconduct without due process." *Id.* at 725.

Brown argues that defendants Porter and Johnson violated his procedural due process rights when they investigated, expelled, and later denied his appeal, allegedly in violation of NSU's published procedures for disciplinary proceedings and appeal resolutions. Compl. ¶¶ 100–01, 105–08. As explained earlier, based on the facts stated in his complaint, Brown has properly alleged a qualifying liberty interest for his procedural due process claim, thereby satisfying the first step of the qualified immunity analysis. *Id.* at ¶¶ 78–79, 88, 95; *see also GMU*, 132 F. Supp 3d at 724. However, determining whether defendants Porter and Johnson are entitled to qualified immunity requires more than alleging that the disciplinary procedures utilized in this case violated Brown's due process rights and deprived him of a liberty interest. At step two of the qualified immunity test, it must be shown that the right violated was "clearly established." *Cole*, 328 F. App'x at 207; *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (looking at whether it was "sufficiently clear that every reasonable official would have understood that what he [wa]s doing violates that right") (citation and quotation marks omitted). Using the framework from *GMU*, the Court has considered whether Brown's federal due process rights in the context of school disciplinary conferences were clearly established *at the time* of defendants' alleged misconduct, and finds that they were not.

In *GMU*—which was decided only eight months before the events discussed in this case—the plaintiff, accused of sexual misconduct, alleged that the university did not adhere to university

27

guidelines when it conducted disciplinary hearings, appeals, and imposed sanctions related to plaintiff's misconduct. *GMU*, 132 F. Supp. 3d 725–26. Asserting a procedural due process claim, plaintiff argued he had a protected liberty interest in his "good name, reputation, honor, and integrity" and that, unless his expulsion for sexual misconduct was "overturned," it would "remain a part of Plaintiff's permanent educational records and . . . substantially limit his ability to transfer to another undergraduate institution, attend graduate school, or secure future employment." *Id.* at 723–24. The *GMU* plaintiff analogized his "protected reputational liberty interest" in his education to the liberty interest claimed by public employees terminated for misconduct. *Id.* at 722. The Court reasoned that, under Fourth Circuit jurisprudence, "a liberty interest is implicated by the public announcement of reasons for an employee's discharge," because its publication could affect an individual's "opportunity for other gainful employment." *Id.* at 723–24.

But, while the Court understood the analogy, and agreed that expulsion from college on grounds of misconduct "implicate[d] a protected liberty interest," it reasoned that "it does not necessarily follow that 'every reasonable official' would foresee such an analytical move." *Id.* at 724, 726. Consequently, the Court held "[t]he mere fact that defendants may have known that [certain disciplinary] procedures were necessary does not mean that they knew or should have known that the procedures were protecting a federal constitutional interest in reputational liberty." *Id.* at 726. The fact that certain procedures were in place at the university suggested that the school officials who handled plaintiff's disciplinary hearings "were aware that certain minimum process is necessary," but the source of minimum process could stem from "the state constitution, state statute, state administrative regulation, or, indeed, merely the judgment of responsible officials." *Id.*

The Court concluded, "[i]n light of the law as it existed at the time of the alleged violation

[in 2014], it was not 'beyond debate' that certain minimum procedures were necessary for the protection of a federal constitutional liberty interest in the context of disciplinary hearings for students at a state college or university." *Id.* at 726–27; *see also Herron*, 366 F. Supp. 2d at 361 (finding that the plaintiff could not show that the right to "certain procedure" in the school disciplinary context was a "clearly established" right such that a failure to apply those procedures resulted in an "established constitutional deprivation"). Consequently, "[g]iven the absence of clear and settled authority putting the existence of a protected reputational liberty interest beyond debate in the context of state college and university disciplinary hearings," the defendants in *GMU* were entitled to qualified immunity, to the extent they had been sued in their individual capacities. *Id.* at 727. And, because Brown has not offered any new case law supporting a clearly established right to certain procedures in the school disciplinary context, so too does he fail to negate Porter and Johnson's defense of qualified immunity.

Accordingly, the Court **RECOMMENDS** that count I's due process claims against defendants Porter and Johnson be **DISMISSED with prejudice** on grounds of qualified immunity.

F.      **Brown's freedom of speech claim (count II) is too vague and fails to state a claim under Rule 12(b)(6).**

In count II, Brown brings a freedom of speech claim, alleging that Porter and Johnson, government officials, based their decisions to expel Brown, and to deny his appeal, in part, on his "Constitutionally protected speech." Compl. ¶¶ 119–21. Consequently, Brown contends that Porter and Johnson are liable to him for "these abridgments of his Constitutional right to free speech," pursuant to 42 U.S.C. § 1983. *Id.* at ¶ 122. Defendants Porter and Johnson seek dismissal of count II for failure to state a claim upon which relief can be granted.

The First Amendment of the United States Constitution is made applicable to the states through the Fourteenth Amendment. *Virginia v. Black*, 538 U.S. 343, 358 (2003). The

29

Constitution of Virginia has also enshrined the right to free speech. Va. Const. art. I, § 12.

To properly state a First Amendment claim under section 1983, Brown must allege that "(1) []he engaged in protected First Amendment activity, (2) the defendant[] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant[s'] conduct." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (internal quotation marks omitted). Plaintiffs seeking recovery for retaliation must demonstrate that "defendant's conduct resulted in something more than a '*de minimis* inconvenience' to h[is] exercise of First Amendment rights." *Constantine*, 411 F.3d 474, 500. To do this, plaintiff must show that "a person of ordinary firmness" would be deterred from the exercise of First Amendment rights because of defendant's retaliatory conduct. *Id.* (internal quotation marks omitted). To establish a causal connection between his First Amendment activity and "the alleged adverse action," a plaintiff must show, "at the very least, that the defendant was aware of h[is] engaging in protected activity." *Id.* at 501 (citation omitted). Additionally, there "must also be some degree of temporal proximity to suggest a causal connection," such that, "[a] lengthy time lapse between the [official's] becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two." *Id.* (citation and internal quotation marks omitted).

While Brown alleges that defendants have "abridg[ed]" his Constitutional right to freedom of speech, he does not specifically indicate which act or acts of free speech defendants abridged. *See* Compl. ¶¶ 116–23. In the statement of facts in his complaint, Brown identifies two distinct acts of speech that may be at issue in this case: (1) his text message to Smith; and (2) his appeal

letter to defendants following his conduct conference.[14]  *Id.* at ¶¶ 29, 64.  The Court will evaluate both acts of speech.

First, Brown's text message constitutes a true threat.  "[T]rue threats of violence constitute a category of speech falling outside the protections of the First Amendment."  *GMU*, 132 F. Supp. 3d at 729 (citing *Black*, 538 U.S. at 359).  A true threat is a statement "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  *Id.*  As the Fourth Circuit noted in *United States v. White*, the true threats exception is justified by the need to "protect[] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur."  670 F.3d 498, 507 (4th Cir. 2012) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)) (internal quotation marks omitted).  To determine whether a statement is a true threat, the Fourth Circuit uses an objective test—a "statement is a true threat 'if an ordinary reasonable recipient who is familiar with the context . . . would interpret [the statement] as a threat of injury.'"  *GMU*, 132 F. Supp. 3d at 729 (quoting *White*, 670 F.3d at 507).  Because the standard of review is objective, "the context of the communication is essential to determine whether it is protected by the First Amendment."  *In re White*, No. 2:07cv342, 2013 WL 5295652, at *44 (E.D. Va. Sept. 13, 2013) (citing *Watts v. United States.*, 394 U.S. 705, 707–08 (1969)).  Courts in the Fourth Circuit have "identified certain contextual factors relevant to the analysis of allegedly threatening remarks."  *Id.*  These factors include the language itself, and "the context in which [the threat] was made, including not only the forum in which the statement was communicated, but also the reaction of the audience upon its utterance."  *Id.* at *45.

---

[14] Neither Brown's text message nor his appeal letter is attached to the complaint as exhibits, but Brown includes the language of his text message in his statement of facts. *See* Compl. ¶ 29.

In this case, Brown's text message communicated a threat: "text me again and im [sic] breaking your jaw." *Id.* at ¶ 29. However, the text message needs to be considered in its proper context. *See In re White*, 2013 WL 5295652, at *44. Here, Brown alleges that he and Smith were texting each other from within their dorm room, either from the same room, or from adjoining rooms. Compl. ¶ 27. Further, Brown alleges that their texting conversation related to "food and dirty dishes in their room," and that "[e]vidence available to NSU officials indicated that Smith considered the texting conversation to be playful in nature." *Id.* at ¶¶ 26, 28, 59. Brown contends that a third individual was present during their texting conversation and could have testified as to the nature of the text message, but that defendants Porter and Johnson declined to consider this evidence. *Id.* at ¶¶ 66, 71. Lastly, Brown alleges that, following his text message, Smith sent a responding text message, and Brown did not break Smith's jaw. *Id.* at ¶¶ 30–31.

Even viewed in the light most favorable to him, Brown's text message constitutes a true threat. While Brown's memorandum provides the context through which he may have otherwise proven his text message was not a true threat, that context is absent from his complaint. Instead, all that Brown alleges regarding the text message is the following: (1) the text of the message itself, which, without context, communicates a threat; (2) that the texting conversation occurred while Brown and Smith were in their dorm room; (3) that there may have been a witness present when he sent the message; (4) that evidence available to NSU indicated Smith considered the texting conversation with Brown to be playful; and (5) that Smith responded to the text and Brown did not break his jaw. Compl. ¶¶ 28–31, 66.

That Smith responded to Brown's text, from within the same dorm room, where a witness may have been present, and that Brown did not break Smith's jaw, has no bearing on whether Brown's message was threatening. Brown's other contention, that "[e]vidence available to NSU

32

officials indicated that Smith considered the texting conversation to be playful in nature," *id.* at ¶ 28, is too conclusory. *See, e.g., Iqbal*, 556 U.S. at 678 (holding that "naked assertion[s] devoid of further factual enhancement" are not sufficient under *Iqbal's* "plausibility" standard); *Nemet*, 591 F.3d at 256 (deciding that, without the "heft" of sufficient facts to support his claims, "plaintiff[] . . . cannot establish a valid entitlement to relief, as facts that are 'merely consistent with a defendant's liability,' fail to nudge claims 'across the line from conceivable to plausible'") (internal citations omitted) (quoting *Iqbal*, 556 U.S. at 674, 680).

Brown's allegations do not indicate how Smith perceived the conversation. Nor do they expound on the "evidence available" to NSU concerning Smith's interpretation of the text message. On these facts alone, Brown's allegations do not carry the "heft" of "sufficient facts" to support his free speech claim. *Nemet*, 591 F.3d at 256. Consequently, the Court cannot determine that Brown's text was anything other than what it appeared to be out of context—a threat. Brown has not alleged facts sufficient to establish that his text message to Smith was not a true threat. Accordingly, his text message is excepted from the First Amendment free speech protection.

Brown also alleges that, after NSU sent Brown a resolution letter informing him he was being expelled from the school, Brown filed an appeal, as was his entitlement under NSU's code of student conduct. *Id.* at ¶¶ 53, 64; Compl. Ex. 6 at 31. Brown further alleges, based in part on the language and content of his appeal letter to NSU, Porter and Johnson denied Brown's appeal of his expulsion. Compl. ¶¶ 64, 72. From this, Brown contends that Johnson denied his appeal based upon constitutionally-protected speech. *Id.* at ¶ 121. In essence, Brown is asserting that, based on the content of the appeal letter submitted to Johnson, Johnson denied his appeal and thereby affirmed Brown's expulsion. Brown does not provide additional information to identify

in what way Johnson's action in denying Brown's appeal violated his right to free speech.[15] The Court cannot make assumptions as to Brown's claims and legal arguments—as such, without more, Brown's allegation that Johnson's decision to deny his appeal based on his constitutionally-protected speech is vague and conclusory.

For the reasons stated above, Brown has not sufficiently alleged a free speech claim for his two acts of speech, his text message and appeal letter. Accordingly, the Court **RECOMMENDS** that defendants' motion to dismiss count II be **GRANTED**.

**G.** **Count III's claim of gender discrimination under Title IX fails to state a claim upon which relief can be granted.**

In count III, Brown asserts a gender discrimination claim under Title IX against the Commonwealth of Virginia, NSU and the Board, alleging he was improperly expelled from NSU based on his gender.[16]

As a starting point, Brown notes, because NSU receives federal funding, it is subject to the requirements of Title IX. Compl. ¶ 11–12, 125–26; *see also* 20 U.S.C. § 1681 (1986). Brown next alleges he, "a male, was investigated and expelled from NSU following a student complaint that Brown violated the student conduct policy with threatening behavior." Compl. ¶ 127. To contrast the actions NSU took to investigate and expel him, Brown alleges that, "[o]ver a year prior to [his] expulsion, Brown complained to NSU officials that a female student had violated the student conduct policy with threatening behavior." *Id.* at ¶ 128. Additionally, Brown alleges that

---

[15] The Court recognizes Brown's assertions may be the beginning of First Amendment retaliation claim, but Brown says nothing more to substantiate this claim.

[16] Brown's claim against the Commonwealth of Virginia is barred because Title IX does not provide a cause of action against the Commonwealth; it only applies to "education[al] program[s] or activit[ies] receiving Federal financial assistance." 20 U.S.C. § 1681 (1986). To the extent that Brown brings his claim against NSU, he has clarified that defendant "NSU" is both the university and the Board of Visitors. Compl. ¶ 14.

NSU did not conduct any investigation or impose any disciplinary action on the female student. *Id.* at ¶ 129. Upon information and belief, Brown alleges that NSU "rarely if ever investigates or disciplines females for the conduct Brown was accused of committing." *Id.* at ¶ 130. As a result, Brown alleges that NSU's and the Board's decision to investigate and expel him constituted gender discrimination in violation of Title IX. *Id.* at ¶ 131.

Title IX provides, in part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681 (1986). Title IX may be enforced through an "implied private right of action." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979)). Claims "attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories": (1) selective enforcement, and (2) erroneous outcome. *Id.* at 715. In his memorandum in opposition to defendants' motion to dismiss, Brown asserts he has brought an erroneous outcome Title IX claim. Pl.'s Mem. at 20. To "assess whether a school's disciplinary proceedings produced an erroneous outcome in violation of Title IX, courts typically apply a framework first introduced in *Yusuf.*" *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 765 (D. Md. 2015); *see also GMU*, 132 F. Supp. 3d at 732 (same).

An erroneous outcome claim is one in which a plaintiff alleges he was "innocent and wrongly found to have committed an offense" because of his gender. *Yusuf*, 35 F.3d at 715. To make such a claim, Brown must allege the following: (1) "particular facts sufficient to cast doubt on the accuracy of the outcome of the challenged proceeding," and (2) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *GMU*, 132 F. Supp. 3d at 732.

35

### 1. Brown has alleged facts sufficient to cast doubt on the accuracy of the outcome of his conduct conference.

As for the first element of an erroneous outcome claim—requiring plaintiff to allege facts

"sufficient to cast doubt on the accuracy of the outcome of the challenged proceeding," *GMU*, 132

F. Supp. 3d at 732, the court in *Yusuf* observed that plaintiff's burden

> is not heavy. For example, a complaint may allege particular
> evidentiary weaknesses behind the finding of an offense such as a
> motive to lie on the part of a complainant or witnesses,
> particularized strengths of the defense, or other reason to doubt the
> veracity of the charge. A complaint may also allege particular
> procedural flaws affecting the proof.

*Yusuf*, 35 F.3d at 715.

For example, in *GMU*, a plaintiff accused of sexual misconduct met the pleading burden

of the first element of his erroneous outcome claim by enumerating several procedural flaws

regarding his disciplinary hearing and subsequent appeal. *See GMU*, 132 F. Supp. 3d at 718–19,

732 (alleging the failure to consider witness statements, give deference to the reasoned opinion of

the initial panel, adhere to GMU's own appellate rules, make a reliable credibility determination,

afford plaintiff the ability to oppose the granting of an appeal, and to provide a neutral arbiter

without prior involvement in the case).

Similarly, Brown has pleaded multiple procedural flaws that, considered together, satisfy

the first element of his erroneous outcome claim. He alleges that NSU and the Board: (1) failed

to provide notice of the specific conduct for which Brown was being investigated; (2) did not give

Brown adequate time to prepare for his conduct conference; (3) did not give Brown prior notice

that he was being charged with a probation violation, but Porter included "probation violation" as

a rationale for defendants' decision to expel Brown in the Resolution Letter; (4) did not notify

Brown that expulsion was a likely sanction for his alleged misconduct; (5) did not provide Brown

36

with the procedural safeguards at the June 15, 2017 conduct conference—enumerated in NSU's Code of Student Conduct—afforded to student accused of conduct punishable by "expulsion, suspension and/or removal from housing"; (6) denied Brown a fair and impartial hearing because Porter acted simultaneously as the "investigator, fact finder and decision maker during the proceedings"; (7) held an appeal conference at which Brown was not present and therefore could not present any facts, defenses, or new evidence; (8) in the letter denying Brown's appeal, did not address whether Brown's conduct conference was conducted "fairly and in conformity with prescribed procedures," or whether "new evidence unavailable during the original conduct conference/hearing" was considered; and (9) considered, at the appeal conference, Brown's prior conduct that was "not at issue in the Notice sent by Defendant Porter on June 15, 2017, as well as references to the language and content of Plaintiff Brown's appeal letter."[17] Compl. ¶¶ 46–51, 54–55, 61, 69, 70–72.

Brown's allegations of procedural flaws are numerous, and, collectively, they are sufficient to cast doubt on the accuracy of the outcome of his disciplinary proceeding and on the penalty imposed on him.

### 2.      Brown has not alleged facts sufficient to connect the erroneous outcome of his conduct conference with gender bias.

Having satisfied the first element of his erroneous outcome claim, Brown must now contend with the second element, and allege "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *GMU*, 132 F. Supp. 3d at 732.

As the *Yusuf* court explained, "allegations of a procedurally or otherwise flawed proceeding

---

[17] Brown alleges other procedural flaws, but he pleads them so ambiguously that this Court cannot, even when considering the facts in the light most favorable to Brown, *Nemet*, 591 F.3d at 253, factor them into its analysis. *See* Compl. ¶¶ 47–50.

that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Yusuf,* 35 F.3d at 715. The "fatal gap" is the "lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias." *Id.* Therefore, a plaintiff must satisfy the second element by alleging "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* "Sufficiently particularized allegations of gender discrimination might include, *inter alia,* statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Salisbury,* 123 F. Supp. 3d at 766 (quoting *Yusuf,* 35 F.3d at 715).

Even if a plaintiff is only able to allege facts for the second element "upon information and belief," this is a "permissible way to indicate a factual connection that a plaintiff reasonably believes is true but for which the plaintiff may need discovery to gather and confirm its evidentiary basis." *Id.* at 768; *see* Fed. R. Civ. P. 11(b) advisory committee's note to the 1993 amendment; 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1224 (3d ed.) ("[A]llegations in this form have been held to be permissible, even after the *Twombly* and *Iqbal* decisions."); *see also Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible.") (internal citations and quotations omitted). That being said, a plaintiff may not "rely exclusively on conclusory allegations of unlawful conduct, even where alleged 'upon information and belief.'" *Salisbury,* 123 F. Supp. 3d at 768.

In *Yusuf*, the court found sufficient plaintiff's allegation that "males accused of sexual harassment at Vassar are 'historically and systematically' and 'invariably found guilty, regardless of the evidence, or lack thereof.'" *Yusuf*, 35 F.3d at 716. The court noted that the "allegation that males invariably lose when charged with sexual harassment at Vassar provides a verifiable causal connection similar to the use of statistical evidence in an employment case." *Id.*

But *Yusuf* was decided prior to the Supreme Court's holdings in *Twombly* and *Iqbal*. *See GMU*, 132 F. Supp. 3d at 732. Therefore, "mimicking the *Yusuf* plaintiff's allegations is not necessarily sufficient to survive a motion to dismiss." *Id.* Consequently, a plaintiff must now "plead facts sufficient to support a plausible inference of liability." *Id.*

In *Salisbury*, male university students accused of sexual misconduct alleged that the university "created an environment in which male students accused of sexual assault . . . are fundamentally denied due process as to be virtually assured of a finding of guilt." *Salisbury*, 123 F. Supp. 3d at 755, 766. Additionally, plaintiffs supported their allegation by attaching to their complaint eleven exhibits supposedly evidencing the school's gender bias against male students.[18] *Id.* at 766. Plaintiffs also alleged the following "upon information and belief": (1) "SU possesses communications evidencing Defendants' deliberate indifference in imposing wrongful discipline on Plaintiffs on the basis of their gender"; (2) "SU possesses communications evidencing SU's intent to favor female students alleging sexual assault over male students like Plaintiffs who are accused of sexual assault"; and (3) "Defendants' deliberate indifference was taken to demonstrate to the United States Department of Education and/or the general public that Defendants are

---

[18] Some examples of the exhibits include public notices and newsletters "informing the student body writ large about the risk of sexual assault on college campuses," and the court ultimately found that the eleven exhibits were "presented in a gender-neutral tone, addressed to all students, and published to improve campus safety for both men and women." *Salisbury*, 123 F. Supp. 3d at 766–67.

39

aggressively disciplining male students accused of sexual assault." *Id.* at 768. From these three allegations, the court held that plaintiffs had pleaded "*specific factual allegations*," and therefore presented a "facially plausible claim of erroneous outcome sex discrimination in violation of Title IX." *Id.*

In contrast, the court in *GMU* found that plaintiff, accused of sexual misconduct, had not sufficiently alleged facts that causally connected the flawed outcome of his disciplinary proceeding with gender bias. *GMU*, 132 F. Supp. 3d at 733. After twice being granted leave to amend his complaint, plaintiff alleged the following: (1) that during his appeal, "[t]he findings of responsibility . . . can be based *only* on the unjustified and discriminatory decision to credit Jane Roe's testimony, as the complaining female, over the testimony of John Doe, the responding male"; (2) "[t]he *only* explanation for such a rash, unreasoned, and unsupported decision is [defendants'] desire to help a complaining female when the system had found a respondent male not responsible"; and (3) that "[s]exual misconduct violations are more likely than others to result in the most severe sanctions the University may impose . . . . The vast majority of respondents in the University's sexual misconduct investigations and the disciplinary proceedings are male," and, "[r]espondents charged with Sexual Misconduct at the University are historically and systematically discriminated against." *Doe v. George Mason Univ.*, No 1:15cv209 (E.D. Va. Apr. 7, 2015) (Second Amended Complaint ¶¶ 178, 184, 187, 189–90, ECF No. 27) (emphasis added). Considering them collectively, the court held that "plaintiff's two allegations that gender bias is the 'only' explanation for the outcome of his proceeding are entirely conclusory and entitled to no weight under *Twombly*." *GMU*, 132 F. Supp. 3d at 732–33. Further, the court found that, "in total context an inference of gender bias is certainly *conceivable or possible*, the question is whether the [second amended complaint's] factual allegations make that inference cross the line from

40

conceivable to *plausible*." *Id.* at 733. The Court concluded that plaintiff's complaint "falls short" of plausible  *Id.*

Brown makes two allegations supporting his Title IX erroneous outcome claim: (1) "Over a year prior to Brown's expulsion, Brown complained to NSU officials that a female student had violated the student conduct policy with threatening behavior. [] Upon information and belief, no investigation or disciplinary action was ever taken against the aforementioned female student"; and (2) "Upon information and belief, NSU rarely if ever investigates or disciplines females for the conduct Brown was accused of committing."[19]  Compl. ¶¶ 128–30.  As with the plaintiff's complaint in *Salisbury*, Brown's allegations present a "close call." *Salisbury*, 123 F. Supp. 3d at 766. Ultimately, however, the Court finds that Brown's allegations fall short of the plausibility requirement. *See, e.g.*, *GMU*, 132 F. Supp. 3d at 733.  Brown does not allege that the Commonwealth of Virginia, NSU, or the Board have in their possession any communications, documents, or any other evidence that could substantiate Brown's allegations of gender discrimination. *Salisbury*, 123 F. Supp. 3d at 768. Instead, Brown proffers a conclusory statement similar to the plaintiff's allegation in *GMU*, that NSU rarely "if ever investigates or disciplines" women accused of similar misconduct. Compl. ¶ 130.

Brown does allege that, a year prior to his own conduct conference, he complained that NSU had failed to investigate and discipline a female student accused of violating the same part of the student code as Brown. Compl. ¶¶ 128–29. While this claim is far less conclusory than his

---

[19] Although Brown alleges an erroneous outcome claim under Title IX, upon the Court's review, the allegations appear, in part, to be more similar to a selective enforcement claim. *See Yusuf*, 35 F.3d at 715 ("Such a claim [of selective enforcement] asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."). Yet, regardless of the claim—either erroneous outcome or selective enforcement—the outcome is the same. Brown has not sufficiently pled facts which, even taken in the light most favorable to him, establish grounds for either claim.

general allegation that NSU rarely investigates or disciplines women for threatening behavior, it still does not meaningfully advance Brown's claim across "the line from conceivable to *plausible*." *GMU*, 132 F. Supp. 3d at 733. Even if proven true, this isolated incident does not make Brown's claim plausible. As one court indicated, "there are a number of possible explanations for any disparate treatment, of which gender-motivated bias is only one." *GMU*, 132 F. Supp. 3d at 733. Brown's contention that the school did not investigate and/or discipline one female student allegedly accused of threatening behavior may conceivably be motivated by gender bias—but it may also be motivated by dozens of other factors, discriminatory or non-discriminatory. As the court in *GMU* concluded, "in the absence of any specific factual allegations pointing to such [gender] bias on the part of the defendants, it cannot be said that the discriminatory motive explanation is plausible rather than just conceivable." *Id.* at 733.

For these reasons, this Court **RECOMMENDS** that Brown's erroneous outcome Title IX claim (count III) against defendants NSU and the Board be **DISMISSED** for failure to state a claim.

**H.      Count IV's claim of religiously-based gender discrimination under Title IX fails to state a claim upon which relief can be granted.**

Brown brings his religiously-based gender discrimination claim against the Commonwealth of Virginia, NSU, and the Board, contending that their agents inappropriately asked about his religion, and based the expulsion decision on his gender and religious affiliation.[20]

Brown alleges that Title IX forbids religiously-based discrimination "by institutions such as NSU when it is partially based on gender, ethnicity or national origin." Compl. ¶ 136. Brown

---

[20] For the same reasons Brown could not bring his Title IX gender discrimination claim (count III) against the Commonwealth of Virginia, Brown cannot bring count IV against the Commonwealth. *See* 20 U.S.C. § 1681 (1986).

alleged that, during the conduct conference on June 15, 2017, at the NSU campus police station, Porter asked Brown whether he is Muslim, and Brown responded affirmatively. *Id.* at ¶¶ 44–46. From this, Brown contends that Porter and Johnson based their decision to expel Brown "in part or in whole upon his religious status as a Muslim." *Id.* at ¶ 137. "Upon information and belief," Brown alleges that Porter and Johnson would have been "less likely to expel Brown had Brown been of a different religious conviction." *Id.* at ¶ 138. Brown alleges that "Defendants' interest in Brown's status as a Muslim during investigation and expulsion proceedings stems from a negative stereotype of Muslim males as being prone to violence." *Id.* at ¶ 139. Consequently, Brown alleges that defendants "would have been less likely to expel Brown had Brown been a Muslim female." *Id.* at ¶ 140.

In support of his claim, Brown cites to a 2004 "Dear Colleague"[21] letter issued by the Office of Civil Rights ("OCR"). Pl.'s Mem. 21 (citing Dear Colleague Letter from Kenneth L. Marcus, Deputy Assistant Secretary for Enforcement, Office for Civil Rights, U.S. Dep't of Education (Sept. 13, 2004) ("Dear Colleague Letter")).[22] In the letter, Marcus explains that, while OCR "lacks jurisdiction to prohibit discrimination against students based on religion per se, [it] will aggressively prosecute harassment of religious students who are targeted on the basis of race or gender, as well as racial or gender harassment of students who are targeted on the basis of religion." Dear Colleague Letter; *see also* Pl.'s Mem. at 21 (describing Marcus's letter). For the reasons noted below, the Dear Colleague letter is neither binding nor persuasive authority, and, without

---

[21] A "Dear Colleague" letter is an "official correspondence distributed in bulk to Members in both chambers" of Congress. *See* R. Eric Petersen, Cong. Research Serv., RS21667, "Dear Colleague" Letters: A Brief Overview 1 (2005). Typically, Members of Congress author "Dear Colleague" letters to "persuade others to cosponsor or oppose a bill." *Id.*

[22] Kenneth L. Marcus's letter is available at the following website: https://www2.ed.gov/about/offices/list/ocr/religious-rights2004.html (last visited Nov. 26, 2019).

more, it is insufficient to overcome defendants' motion to dismiss.

Brown cites to *T.E. v. Pine Bush Cent. Sch. Dist. et al.*, 58 F. Supp. 3d 332, 355 (S.D.N.Y. 2014), as a "parallel" to Marcus's Dear Colleague letter that claimed OCR would expand enforcement of Title IX to include religiously-based discrimination. Pl.'s Mem. at 21.  In *Pine Bush*, the court questioned whether Title VI—which prohibits a "recipient of federal funds from discriminating on the basis of race, color, or national origin," 42 U.S.C. § 2000d—proscribed discrimination against Jewish students. 58 F. Supp. 3d. at 353–54.  The students in *Pine Bush* endured extreme "anti-Semitic harassment and discrimination" at the hands of other students.  *Id.* at 354.  While the court noted the harassment amounted to obvious religious discrimination, it also found that anti-Semitic harassment constituted racial discrimination.  *Id.*

In reaching its conclusion, the court did not determine "whether religious bias alone can form the basis of a Title VI claim or anti-Semitism can provide a basis for national origin discrimination."  *Id.*  Rather, the court found that Judaism was both a religious practice and a distinct race, and therefore came "within Title VI's protection."  *Id.*  Ultimately, plaintiffs' amended complaint asserted that the harassment plaintiffs faced "did not concern Plaintiffs' religious beliefs or practices, but rather drew on hackneyed stereotypes, bigoted 'jokes,' and painful references to the Holocaust and Naziism [sic].  In short, the harassment alleged is rooted in Plaintiffs' actual or perceived national origin or race rather than just Plaintiffs' faith or religious practices."  *Id.*  Because the harassment plaintiffs suffered amounted to racial discrimination, the court concluded that plaintiffs' harassment fell under Title VI's protection.  *Id.*

The holding in *Pine Bush* is not relevant here. As Brown does in this case, the *Pine Bush* court also cited to a Dear Colleague letter,[23] but only to help clarify the ambiguity of Title VI as it pertains to the intersection of religion and race/national origin. The same ambiguity does not exist between religion and gender. Identifying as Muslim, as Brown has, does not entitle one to come within the protection of Title IX, and he has presented the Court with no case law to suggest otherwise. While it may be irrelevant and inappropriate to question a student about his religion during a conference regarding the student's conduct, it does not—without more information—suggest gender discrimination and trigger Title IX protections.

For the reasons stated above, this Court **RECOMMENDS** that Brown's religiously-based gender discrimination claim (count IV) against defendants, the Commonwealth of Virginia, NSU, and the Board, be **DISMISSED** for failure to state a claim.

I.      **Count V's breach of contract claim fails to state a claim upon which relief can be granted.**

Brown brings his breach of contract claim, count V, against defendants NSU and the Board, alleging that defendants breached either an express or implied contract that existed between students like Brown and NSU.

Brown alleges that either an express or implied contract existed between himself and NSU during Brown's enrollment. Compl. ¶ 144. First, Brown argues that, as a student, he has a contractual relationship with NSU, and that, "by paying his tuition, maintaining his grades, and abiding by NSU's policies to the best of his ability and understanding," Brown fulfilled his

---

[23] *See* Dear Colleague Letter from Russlynn Ali, Assistant Secretary for Civil Rights, Office for Civil Rights, U.S. Dep't of Education (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html (explaining that "anti-Semitic harassment can trigger responsibilities under Title VI . . . when the harassment is based on the group's actual or perceived shared ancestry or ethnic characteristics, rather than solely on its members' religious practices") (last visited Nov. 26, 2019).

contractual obligations to NSU. *Id.* at ¶ 145. Moreover, when NSU expelled Brown, who had not

violated any of the contractual terms stated above, NSU allegedly violated the express or implied

contract between itself and Brown. *Id.* at ¶ 149. Second, Brown contends that NSU's disciplinary

policies, which NSU makes accessible to students and the larger public online, "constitute

contractual terms between NSU and students like Brown." *Id.* at ¶¶ 24, 147. Similarly, Brown

argues that the "procedures, safeguards, and rights contained within NSU's disciplinary procedures

constitute contractual rights of NSU's students." *Id.* at ¶ 148. Therefore, Brown alleges that, by

failing to adhere to the contractual terms stated within its "posted disciplinary procedures," NSU

breached "one or more of Brown's contractual rights during its investigation and expulsion of him

in June of 2017." *Id.* at ¶¶ 56–58, 149.

Brown's complaint characterizes NSU's disciplinary procedures as binding contractual

terms. Compl. ¶ 147. At this stage, it is not for the Court to decide whether NSU's disciplinary

procedures, and the "procedures, safeguards, and rights contained within" them constituted a

binding contract, Compl. ¶ 148—it just needs to be plausible that they do. *See e.g.*, *Twombly*, 550

U.S. at 570. The Court cannot determine the plausibility of Brown's breach of contract claim,

because Brown has failed to state anything beyond a "naked assertion [] devoid of further factual

enhancement." *Iqbal*, 556 U.S. at 678.

Brown alleged that NSU published its disciplinary procedures online, that the disciplinary

procedures outlined a formal resolution process with procedural safeguards for students accused

of conduct punishable by expulsion, and that Brown did not receive these procedural safeguards.

Compl. ¶¶ 24, 56–58. Brown also attached to his complaint a section of NSU's disciplinary

procedures. *See* Compl. Ex. 6. Even though Brown has provided the Court with the disciplinary

procedures themselves, Brown does not provide any facts to support his assertion that those

disciplinary procedures constitute contractual terms—and without such facts, his breach of contract claim does not meet the pleading standards required for a 12(b)(6) motion to dismiss. *See Iqbal*, 556 U.S. at 678.

Additionally, in a recent 2018 decision, this Court ruled unambiguously that, "[u]nder Virginia law, a University's student conduct policies are not binding, enforceable contracts; rather, they are behavior guidelines that may be unilaterally revised by Marymount at any time." *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 587–88 (E.D. Va. 2018). The *Marymount* court cited to *Brown v. Rectors and Visitors of the Univ. of Va.*, which affirmed there was no contract between the student and the university, "because [plaintiff's] complaint contained only conclusory allegations that the Graduate Student Handbook constituted a contract between himself and UVA, and that assertion was unsupported by the terms of the Handbook." 361 F. App'x 531, 534 (4th Cir. 2010).

Brown's allegations in the current matter appear just as conclusory. Some of the cases cited in *Marymount* hold that, for there to be a binding legal contract between a student and university, there must be an "absolute mutuality of engagement," so that each party has the right to hold the other to a positive engagement. *Marymount*, 297 F. Supp. 3d at 587 n.20 (citing *Jackson v. Liberty Univ.*, No. 6:17-CV-00041, 2017 WL 3326972, at *7 (W.D. Va. Aug. 3, 2017), and *Doe v. Washington and Lee Univ.*, No. 6:14-cv-00052, 2015 WL 4647996, at *11 (W.D. Va. Aug. 5, 2015) (quoting *Smokeless Fuel Co. v. W.E. Seaton & Sons*, 52 S.E. 829, 830 (Va. 1906))). Brown has not provided any factual support to show that the code of student conduct creates a "mutuality of engagement" such that NSU's actions in investigating and expelling Brown could be characterized as a breach of contract. *See* Compl. ¶¶ 143–52.

To further support his claim that an express or implied contractual relationship exists between a student and the university the student attends, Brown cites to a 2015 Norfolk Circuit Court case. Pl.'s Mem. at 23 (citing *Doe v. Va. Wesleyan Coll.*, Nos. CL14-6942-01, CL14-6942-00, 2015 WL 10521466, at *1 (Va. Cir. June 20, 2015)). In *Wesleyan*, Doe, a female student at Virginia Wesleyan College, alleged that a male student, Roe, raped and sexually assaulted her in a college dorm room. *Id.* at *1. Doe alleged that, prior to her assault, she had attended an on-campus party "sponsored" by school employees, at which she consumed alcohol "spiked with an agent designed to incapacitate [Doe and others] and render them vulnerable to sexual assault." *Id.* After Doe left the party, she alleged that Roe followed her and forced her into his dorm room where he raped and sexually assaulted her. *Id.* Doe filed a lawsuit against the college, and the college later filed a third-party complaint against Roe, alleging that Roe had breached his contract with the college. *Id.* Roe then filed a demurrer to the college's third-party complaint, arguing that the "alleged contracts disclaim contractual liability." *Id.* at *2.

In assessing the college's breach of contract claim, the court clarified that, at the demurrer stage, it would not determine "whether the [purported contracts] are binding legal contracts for purposes of this demurrer." *Id.* at *14, n.13. Therefore, the court assumed, "without deciding that the purported contracts are in fact valid contracts," leaving it to the fact finder to determine the validity of the "contracts." *Id.* Because this case arose in a Virginia circuit court, it is not binding on this Court. Further, because the circuit court only assumed for purposes of the demurrer that the "purported contracts" were valid contracts, it would not be appropriate to rely on this tentative authority, even at the motion to dismiss stage.

In *Marymount*, a male university student accused of sexual misconduct brought suit against the university, alleging that the school breached an "implied contract with Doe by suspending him

48

from school without just cause." 297 F. Supp. 3d at 576, 580.  In addressing a motion to dismiss, the Court was tasked with deciding whether paying tuition to the university "vested Doe with certain implied procedural protections that were ultimately breached by Marymount." *Id.* at 580. Noting that the parties had not cited a single "Supreme Court of Virginia decision holding that an implied contract is created between a student and his or her university merely through the payment of tuition," the court refused to "impermissibly expand Virginia law without any input from Virginia's highest court." *Id.* at 588.

Further, the Court reasoned that, even assuming "without deciding that an implied contract existed between Doe and Marymount," the contractual terms "between these two parties are exceptionally narrow." *Id.*  The only possible binding, "implied term" was that Doe could not "be suspended for an arbitrary and capricious reason or no reason at all." *Id.*  Even if the outcome of Doe's "disciplinary proceeding was erroneous," Marymount "did not act arbitrarily or capriciously by suspending Doe and therefore did not breach the only term of the implied contract." *Id.*

In this case, while Brown may have alleged facts sufficient to show that NSU and the Board—through its employees, Porter and Johnson—did not provide all the procedural safeguards enumerated in the code of student conduct, he has not alleged facts indicating that they acted in a way that was arbitrary and capricious.  Porter notified Brown in advance that he was being investigated for violating a specific section of the student code of conduct and that a conduct conference would be held to determine whether Brown was responsible for the alleged violation. Compl. Exs. 1–2.  Further, Brown was given an opportunity, and ultimately exercised his right to appeal NSU and the Board's decision to expel him by submitting an appeal letter.  Compl. ¶ 64. Johnson responded to Brown's appeal letter with an appeal response and rationale, explaining the decision to deny Brown's appeal.  *Id.* at ¶¶ 67–69.  NSU and the Board allegedly may have

bypassed or neglected to afford Brown every procedural safeguard listed in the code of student conduct, but Brown has not pled facts sufficient to indicate that they acted in such an extreme way that their actions were arbitrary or capricious. Therefore, Brown has failed to state a claim for breach of contract.

For the reasons stated above, the Court **RECOMMENDS** that Brown's breach of contract claim (count V) against defendants NSU and the Board be **DISMISSED without prejudice**.

## IV.    RECOMMENDATION

Accordingly, the Court **RECOMMENDS** the following:

(1)    Although Brown has sufficiently pled and stated a due process claim, the Commonwealth of Virginia, NSU, and the Board are immune from suit under the Eleventh Amendment and sovereign immunity, and the individual defendants, Porter and Johnson, are entitled to qualified immunity. Therefore, defendants' motion to dismiss Brown's due process claim should be **GRANTED** and count I should be **DISMISSED with prejudice**.

(2)    Defendants' motion to dismiss Brown's free speech claim (count II) against Porter and Johnson for failure to state a claim should be **GRANTED**.

(3)    Defendants' motion to dismiss Brown's Title IX gender discrimination claim (count III) against the Commonwealth of Virginia, NSU, and the Board for failure to state a claim should be **GRANTED**.

(4)    Defendants' motion to dismiss Brown's Title IX religiously-based gender discrimination (count IV) against the Commonwealth of Virginia, NSU and the Board for failure to state a claim should be **GRANTED**.

(5)    Defendants' motion to dismiss Brown's breach of contract claim (count V) against NSU and the Board for failure to state a claim should be **GRANTED**.

(6)      Plaintiff be **PROVIDED** with leave to amend counts II through V within fourteen days of the final order addressing the motion to dismiss.

## V.      **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____ /s/

Robert J. Krask
United States Magistrate Judge
Robert J.  Krask
United States Magistrate Judge

Norfolk, Virginia
November 26, 2019

51