# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

JOSEPH COVELL BROWN,

        Plaintiff,

v.                                                          ACTION NO.  2:19cv376

MARCUS PORTER, in his individual
capacity,
NORFOLK STATE UNIVERSITY,
THE BOARD OF VISITORS OF
NORFOLK STATE UNIVERSITY,
THE COMMONWEALTH OF
VIRGINIA, and
TRACCI K. JOHNSON, in her
individual capacity,

        Defendants.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

This matter comes before the Court on the motion to dismiss plaintiff's amended complaint for lack of subject matter jurisdiction and for failure to state a claim, filed by defendants Marcus Porter, Norfolk State University ("NSU"), the Board of Visitors of Norfolk State University ("the Board"), the Commonwealth of Virginia, and Tracci K. Johnson ("defendants"). ECF No. 36. The motion was referred to the undersigned United States Magistrate Judge on June 10, 2020, pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). ECF No. 45. For the reasons discussed below, the undersigned **RECOMMENDS** that the motion to dismiss be **GRANTED**.

## I.    PROCEDURAL HISTORY

The underlying facts and procedural history are more fully set forth in the report and recommendation, ECF No. 14, addressing the first motion to dismiss and memorandum order, ECF No. 19, adopting the report and recommendation.

Joseph Covell Brown ("Brown") filed an amended complaint against all defendants on February 20, 2020, alleging violations of his right to free speech, gender discrimination in violation of Title IX, and breach of contract—which Brown has numbered counts II, III, and V to correspond to the original complaint.  ECF No. 20 ("Am. Compl.").[1]  After being granted leave to file a response out of time, defendants filed a motion to dismiss Brown's amended complaint with a memorandum in support on May 13, 2020.  ECF Nos. 36–37.  Brown filed a memorandum in opposition on May 27, 2020, to which defendants replied out of time on June 3, 2020.  ECF Nos. 38, 44.  This matter is ready for decision.

## II.    FACTUAL BACKGROUND[2]

Brown attended NSU, a public institution receiving federal funds, from August 2014 through June 2017.  Am. Compl. ¶¶ 5, 9–10.  Prior to the incident in this matter, Brown completed a period of disciplinary probation for the 2016 to 2017 academic year, which ended in May 2017. *Id.* ¶¶ 17–19.

On June 11, 2017, Brown and his roommate, Davonte' Smith ("Smith") were engaged in

---

[1] Brown voluntarily withdrew count IV of the original complaint, his religiously-based gender discrimination claim.  *See* Pl.'s Mem. in Opp. to Mot. to Dismiss Am. Compl. ("Pl. Opp."), ECF No. 38 at 1–2.

[2] The factual history detailed below is based on Brown's amended complaint, consistent with the standard of review detailed below.

an argument through text, and exchanging insults about food and dirty dishes in their room.[3]  *Id.*
¶¶ 32–33, 112, 118.  During the argument, Smith and Brown were both in their shared dorm room,
either in the same or adjoining rooms.  *Id.* ¶ 113.  A witness, Caleb Wright, was also present in the
dorm room during the texting conversation, and reportedly "sensed no hostility from either
Plaintiff Brown or Smith."[4]  *Id.* ¶¶ 115–16.

        During this argument, Brown sent Smith the text at issue, stating, "Text me again and im
[sic] breaking your jaw."  *Id.* ¶ 119.  Brown clarifies that he did not intend to break Smith's jaw or
for Smith to interpret the text as a serious threat.  *Id.* ¶¶ 120–22, 137.  Less than three minutes after
receiving Brown's text, Smith responded, "No chick b.  Your shit getting ate if its [sic] on my pan
again.  All facts."  *Id.* ¶ 126.  Brown alleges Smith's quick response is "evidence that [Smith] was
in fact not taking [Brown's text] or any of the conversation seriously."  *Id.* ¶ 131.  Brown
interpreted the phrase, "[y]our shit getting ate," as a threat of imminent stabbing or attack, but was
not put in fear of that attack because he was not taking the conversation seriously.  *Id.* ¶¶ 127–29.
Despite their conversation, Brown and Smith "continued their cohabitation of the dorm room
peacefully and without incident."  *Id.* ¶ 133.

        Although the timeline is unclear, Smith waited between one and three days before reporting
Brown's text message to his Resident Hall Director, Anthony Tillman ("R.A. Tillman").  *Id.*
¶¶ 134, 142(i).  Smith reportedly stated, "there has been no real problem in the room," but
"[Brown] is using [Smith's] items more often especially during the summer," and they "had a

---

[3] At this time, Brown was suffering from sciatica in his left hip and "could barely walk."  Am.
Compl. ¶¶ 20, 123.  Brown asserts he had a "reasonable belief" that Smith knew of Brown's
sciatica.  *Id.* ¶ 124.

[4] Wright's impression is presented through an appeal letter authored by Brown.  Am. Compl. ¶ 116.
It is not clear whether Wright ever provided a witness statement.

3

'playful' argument about [Brown] using [Smith's] items" and that, "[a]s a response to Smith saying, 'if you keep using my stuff, then I'm expecting that food to be mine too,' Brown stated[,] 'you're all talk, I'll break your jaw.'"[5] *Id.* ¶ 134.

On June 14, 2017, after NSU officials were made aware of Brown's text message, Marcus Porter ("Porter"), the Assistant Director of Student Conduct, informed Brown via email that he had violated NSU's Code of Student Conduct and instructed him to vacate his dorm room immediately. *Id.* ¶¶ 7–8, 39–42. Brown was expelled from NSU on June 15, 2017, following a hearing held that day. *Id.* ¶¶ 47–70.

On June 22, 2017, Brown appealed his expulsion to defendant Tracci K. Johnson ("Johnson"), NSU Dean of Students, requesting the following on appeal: (1) a determination of whether the hearing was conducted fairly and in conformity with NSU disciplinary procedures; (2) consideration of new evidence, including the presence of a witness during the incident at issue; and (3) consideration of whether the sanction imposed, expulsion, was proportionate to Brown's misconduct. *Id.* ¶¶ 71–73, 144–48; ECF No. 20-9. Brown attached his appeal letter as an exhibit to his amended complaint. ECF No. 20-9. The appeal letter directs "frustrated and disrespectful language" at Porter and Johnson,[6] Am. Compl. ¶ 151, and states, in part:

> Now you want to use the campus police as your personal militia to harass, follow and intimidate over words I used to defend myself from Devonte Smith who willingly failed to comprehend numerous warnings to cease contact with me. You saw the evidence and still chose to have selective hearing, eyesight and deduction skills. That will be your misfortune, Mr. Porter.

ECF No. 20-9 at 3.

---

[5] Brown uses quotation marks in the amended complaint, but there is no indication that he is directly quoting Smith.

[6] In his appeal letter, Brown asserts Porter is, among other things, an idiot, a jackass, deceitful, and a "lying, brown-nosing piece of shit . . . . [who] deserve[s] to be fired." ECF No. 20-9 at 2–4.

4

On June 28, 2017, Johnson denied Brown's appeal.  Am. Compl. ¶¶ 74–79, 153–54.  The appeal response, also attached as an exhibit to the amended complaint, listed the following grounds for upholding the expulsion:

> The student was a threat to the Norfolk State University community.  He threatened to break his roommate's jaw.  In his previous conduct case he punched someone in the face.  Based on the language and content of his appeal letter, I felt that his behavior was volatile and I did not want to compromise the safety of the student body.

ECF No. 20-5.

Brown alleges that, "[u]pon information and belief," he "wrote one or more articles available to the university community that brought to light one or more problems he saw with NSU and/or its officials."  Am. Compl. ¶ 170.  Additionally, Brown asserts that, "[u]pon information and belief," he "spoke to other members of the university community about one or more problems he saw with NSU and/or its officials."  *Id.* ¶ 171.[7]

The amended complaint contains three counts.  Count II alleges that defendants Porter and Johnson violated Brown's right to free speech under the United States and Virginia Constitutions by basing the decisions to expel Brown and deny his appeal on three acts of constitutionally-protected speech:  the text message, his appeal letter, and his articles or conversations regarding problems at NSU.  *Id.* ¶¶ 106–76.  Count III alleges that the Commonwealth of Virginia, NSU, and the Board discriminated against Brown based on his gender, in violation of Title IX, by expelling him when they "rarely if ever" investigated or disciplined females for sending text messages.  *Id.* ¶¶ 177–200.  Lastly, count V alleges that NSU and the Board breached Brown's contractual rights during its investigation and expulsion of Brown.  *Id.* ¶¶ 201–62.

---

[7] Brown does not specify the dates on which these acts took place, or clarify the content or subject of these articles or conversations.  *See* Am. Compl. ¶¶ 170–74.

### III.   ANALYSIS

**A.   The standard of review for a Rule 12(b)(6) motion to dismiss.**

Rule 12(b)(6) provides for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint"; it does "not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While plausibility "is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When reviewing a motion to dismiss, the Court must "assume all [well-pled facts] to be true" and "draw all reasonable inferences in favor of the plaintiff," but it does not "need [to] accept the legal conclusions drawn from the facts, and [] need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citations and internal quotation marks omitted). Accordingly, the Court should only grant a Rule 12(b)(6) motion if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244.

6

A motion to dismiss under Rule 12(b)(6) must be considered in light of Federal Rule of Civil Procedure 8(a)(2).   Rule 8(a)(2) requires a complaint to contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  This statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Additionally, when considering a motion to dismiss for failure to state a claim, a court may only consider the pleadings, which include "documents attached as exhibits or incorporated by reference." *Carrington v. HSBC Bank USA, N.A.*, 760 F. Supp. 2d 589, 592 (E.D. Va. 2010); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) ("[O]ur evaluation is . . . generally limited to a review of the allegations of the complaint itself.").

**B.**   **The standard of review for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction where a party is entitled to immunity.**

Rule 12(b)(1) permits a defendant to move for dismissal of a claim based on a court's lack of subject-matter jurisdiction. *A.W. ex rel. Wilson v. Fairfax Cty. Sch. Bd.*, 548 F. Supp. 2d 219, 221 (E.D. Va. 2008).  "[S]overeign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject [] matter jurisdiction." *Cunningham v. Gen. Dynamics. Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018); *see also Drewrey v. Portsmouth City Sch. Bd.*, 264 F. Supp. 3d 724, 727 (E.D. Va. 2017) (noting that the Eleventh Amendment "inhibit[s] the exercise" of a court's subject matter jurisdiction (citation and internal quotation marks omitted)).

"A defendant may challenge the court's subject matter jurisdiction in one of two ways: (1) the defendant may raise a 'facial challenge' by arguing that the facts alleged in the complaint are not sufficient to confer subject matter jurisdiction on the court or (2) the defendant may raise a 'factual challenge' by arguing that the jurisdictional allegations made in the complaint are not

true." *Brunelle v. Norfolk S. Ry. Co.*, No. 2:18cv290, 2018 WL 4690904, at *2 (E.D. Va. Sept. 28, 2018) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). "In a facial challenge, the court evaluates the facts in a complaint using the same standard used for a Rule 12(b)(6) motion to dismiss,"—namely, "all alleged facts are taken as true and the motion must be denied if the complaint alleges facts that, if proven, would be sufficient to sustain jurisdiction." *Id.* (citing *Kerns*, 485 F.3d at 192).

In this case, defendants challenge count II of Brown's amended complaint pursuant to Rule 12(b)(1) by relying only on the allegations noted on the face of the complaint. *See* ECF No. 37 at 19 ("The Amended Complaint illustrates that the constitutional right Brown alleges was violated was not clearly defined within the factual situation at hand. Accordingly, Porter and Johnson are entitled to qualified immunity and this Court should dismiss Count II with prejudice for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)."). Therefore, the Court concludes that defendants have raised a facial challenge to subject matter jurisdiction and, "will accept as true all facts alleged in [Brown's amended complaint] for the purposes of determining whether the court has subject matter jurisdiction over this claim." *Brunelle*, 2018 WL 4690904, at *2.

C.    **Brown's free speech claims premised on Brown's text message and appeal letter, brought against defendants Porter and Johnson in their individual capacities in count II, are barred by qualified immunity.**

In count II, Brown alleges that government officials, Porter and Johnson, expelled him in retaliation for exercising his right to free speech under the First Amendment of the United States Constitution and article I, section 12 of the Constitution of the Commonwealth of Virginia.[8]  Am.

---

[8] "The Supreme Court of Virginia has held that 'Article I, § 12 of the Constitution of Virginia is coextensive with the free speech provisions of the federal First Amendment.'" *Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 607 (E.D. Va. 2015) (quoting *Elliott v. Commonwealth*, 593 S.E.2d 263, 269 (Va. 2004)).

Compl. ¶¶ 107–08, 175. Defendants move for dismissal of count II for lack of subject matter jurisdiction on the grounds of qualified immunity. Mem. in Support of Defs.' Mot. to Dismiss at 16–19, ECF No. 37. Porter and Johnson are shielded by qualified immunity because it is not clearly established that expelling a student for communicating a threat to his roommate, and upholding that decision on appeal, violates the student's constitutional right to free speech.

Government officials sued in their individual or personal capacities may be entitled to qualified immunity. *See, e.g.*, *Lane v. Franks*, 573 U.S. 228, 243 (2014). When government officials perform "discretionary functions," they are entitled to qualified immunity from liability for any civil damages—but only "to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).[9] The defense of qualified immunity may be raised in a motion to dismiss. *See Tobey v. Jones*, 706 F.3d 379, 393–94 (4th Cir. 2013); *Willis v. Blevins*, 966 F. Supp. 2d 646, 652 (E.D. Va. 2013).

"Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wilson*, 141 F.3d at 114 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In this way, if "the contours of the constitutional right asserted are not sufficiently clear, the defending state actor has an absolute defense of qualified immunity." *See Herron v. Va.*

---

[9] Brown contends defendants were performing ministerial functions when they decided to deny him the due process rights specified in the student conduct code when considering his expulsion and appeal. Pl. Opp. at 15 (citing *Ministerial Function*, Black's Law Dictionary 457 (3d Pocket Ed. 2006)). The decisions to expel a student and to deny his appeal are clearly discretionary. *See Davis v. Scherer*, 468 U.S. 183, 196 n.14 (1984) (rejecting employee's argument that violation of a personnel regulation constituted the breach of a ministerial duty to follow certain procedures before terminating his employment, and finding the decision to discharge was discretionary).

9

*Commonwealth Univ.*, 366 F. Supp. 2d 355, 361 (E.D. Va. 2004).  Furthermore, "even if a clearly-established constitutional right is implicated, a defense of qualified immunity may still apply if it was objectively reasonable for the state actor to believe that the conduct was lawful under the circumstances."  *Id.*  The burden of establishing entitlement to qualified immunity rests upon a defendant who invokes it.  *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007).

There are two prongs to the qualified immunity analysis.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  The court determines "whether, viewed in the light most favorable to the plaintiff, the defendant violated the constitutional rights of the plaintiff."  *Wood v. Bd. of Educ. of Charles County*, No. GJH-16-00239, 2016 WL 8669913, at *6 (D. Md. Sept. 30, 2016).  If a constitutional right has been violated, the court considers "whether that right was 'clearly established,' such that 'a reasonable official would understand what he [or she] is doing violates that right.'"  *Id.* (quoting *Cole v. Buchanan Cty. Sch. Bd.*, 328 F. App'x 204, 208 (4th Cir. 2009)) (internal citations omitted).  Courts may "grant qualified immunity without first deciding whether a [constitutional] violation occurred so long as the right claimed to be violated was not clearly established."  *Cole*, 328 F. App'x at 207; *see also Wood*, 2016 WL 8669913, at *6 (finding that "fixed adherence to the two-step inquiry" may result in depleting scarce judicial resources).

For a right to be "clearly established," some "existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Brickey v. Hall*, 828 F.3d 298, 303 (4th Cir. 2016).  To determine whether a right is clearly established, a court in the Fourth Circuit "look[s] ordinarily to 'the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose.'"  *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279–80 (4th Cir. 2004) (quoting *Edwards*, 178 F.3d at 251).  Further, to determine whether the right was "clearly established at the time of the defendants' alleged

conduct," the focus is "not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Zepp v. Rehrmann*, 79 F.3d 381, 385 (4th Cir. 1996) (citing *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992)).

Brown contends he engaged in, and defendants retaliated against him for, three separate acts of protected First Amendment activity: (1) his text message; (2) his appeal letter; and (3) written articles and conversations with members of the NSU community about "one or more problems he saw with NSU and/or its officials." Am. Compl. ¶¶ 106–76. In determining whether qualified immunity applies to the first two acts, the Court must determine whether a reasonable official would have understood that expelling a student for threatening his roommate in a text message, and upholding that decision on appeal, violated the student's First Amendment rights.[10]

### 1.   Brown's text conversation

Brown alleges defendants expelled and thereby retaliated against him for constitutionally-protected speech in his text conversation with Smith. *Id.* ¶ 110.

The Supreme Court has made clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 506, 513 (1969), but it has also clarified that "public schools may proscribe speech without running afoul of the First Amendment if necessary to protect students and to support their educational mission." *Doe v. Rector & Visitors of George Mason Univ.* ("GMU"), 132 F. Supp. 3d 712, 729–30 (E.D. Va. 2015) (citing *Tinker*, 393 U.S. at 513). More specifically, public schools and school officials may suppress student speech if they "reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'"

---

[10] The third portion of count II, alleging retaliation in response to Brown's articles and conversations, will be addressed in section III. D.

*Morse v. Frederick*, 551 U.S. 393, 403 (2007) (quoting *Tinker*, 393 U.S. at 513).   The First Amendment has been found to protect students for expressing social and political beliefs, and to prevent public schools from shutting down the "marketplace of ideas." *See Tinker*, 393 U.S. at 505–14 (concerning the suspension of students for wearing black armbands to school to peacefully protest the Vietnam War); *Healy v. James*, 408 U.S. 169, 180–94 (1972) (regarding a college's attempt to ban the organization of a local political chapter).

The First Amendment right to freedom of speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right."[11] *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  To prevail on a First Amendment free speech retaliation claim, "a plaintiff 'must allege that:   (1) he engaged in protected First Amendment activity, (2) the defendant[s] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant[s'] conduct.'" *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005)).

While the First Amendment right to free speech is broad, its protections "are not absolute," and the Supreme Court has "long recognized that the government may regulate certain categories of expression consistent with the Constitution." *Virginia v. Black*, 538 U.S. 343, 358 (2003). "[T]rue threats of violence constitute a category of speech falling outside the protections of the First Amendment." *GMU*, 132 F. Supp. 3d at 729 (citing *Black*, 538 U.S. at 343).  A true threat is a statement in which the "speaker means to communicate a serious expression of an intent to

---

[11] The First Amendment of the United States Constitution is made applicable to the states through the Fourteenth Amendment. *Virginia v. Black*, 538 U.S. 343, 358 (2003).

commit an act of unlawful violence to a particular individual," although the speaker "need not actually intend to carry out the threat." *Black*, 538 U.S. at 359–60. True threats are excepted from constitutional protection to "protect[] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *United States v. White*, 670 F.3d 498, 507 (4th Cir. 2012) (internal quotation and citation omitted). The Fourth Circuit has adopted an objective test to determine whether a statement is a true threat: "a statement is a true threat 'if an ordinary reasonable recipient who is familiar with the context . . . would interpret [the statement] as a threat of injury.'" *GMU*, 132 F. Supp. 3d at 729 (quoting *White*, 670 F.3d at 507). Because the standard of review is objective, the "context of the communication is essential to determine whether it is protected by the First Amendment." *In re White*, No. 2:07cv342, 2013 WL 5295652, at *44 (E.D. Va. Sept. 13, 2013). Contextual factors relevant to the analysis include the language itself, and the "context in which [the threat] was made, including not only the forum in which the statement was communicated, but also the reaction of the audience upon its utterance." *Id.* at *44–45.

In his amended complaint, Brown alleges that, at the time he texted Smith "[t]ext me again and im [sic] breaking your jaw," both he and Smith "were equally aware that they were . . . acting without animosity towards each other despite whatever words they typed into their phones." Am. Compl. ¶¶ 119, 125. Brown alleges he did not intend to break Smith's jaw, and did not expect Smith to interpret the text as a serious threat. *Id.* ¶¶ 120–21. As evidence that Smith did not consider Brown's text message to be a threat, Brown alleges Smith responded to the text in "less than three minutes," stating, "No chick b. Your shit getting ate if its [sic] on my pan again. All facts." *Id.* ¶¶ 126, 131. Brown understood Smith's text to be a "threat of imminent stabbing or attack," and he was "annoyed but not put in fear" of any harm because he "was not taking the

conversation seriously." *Id.* ¶¶ 127–30, 132.

Brown alleges he and Smith continued living in the same dorm room "peacefully and without incident" for one to three days before Smith reported Brown's text to R.A. Tillman. *Id.* ¶¶ 133–36. Even when Smith reported the text message, Brown alleges Smith reported that it was sent in response to a "playful" argument about Brown using Smith's items. *Id.* ¶ 134. Brown further asserts that Smith knew Brown was suffering from sciatica and could barely walk. *Id.* ¶¶ 123–24.

While more development of the record may be necessary to determine if Brown's text message constituted a true threat, a reasonable school official viewing the text message could conclude the message was a true threat—a statement in which the "speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual." *See Black*, 538 U.S. at 359. "At the very least, such a conclusion was not wrong 'beyond debate' at the time of the alleged violation." *GMU*, 132 F. Supp. 3d at 731. Further, a school official could reasonably conclude that allowing such speech would "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513. Brown had previously been disciplined for "punch[ing] someone in the face." ECF No. 20-9. He was expelled because school officials believed he threatened a student and might "compromise the safety of the student body." ECF No. 20-5.

The decision to expel Brown based on his text message, "[t]ext me against and im [sic] breaking your jaw," does not violate any clearly established First Amendment right. Accordingly, Johnson and Porter are entitled to qualified immunity, and defendants' motion to dismiss the portion of count II premised on Brown's text conversation should be **GRANTED**.

## 2..    Brown's appeal letter

Next, Brown alleges Porter and Johnson retaliated against him in violation of his First Amendment right to free speech by denying his appeal because he included "frustrated and insulting" language in his appeal letter. Am. Compl. ¶¶ 110, 166–67. Brown asserts that he directed such language towards Porter and Johnson in his appeal letter because he believed they "were intentionally committing misconduct as officials at a public university." *Id.* ¶¶ 151–52, 162.

The NSU Dean of Students Office form advised Brown that the appeal letter was to be a "one-page narrative stating the specific grounds for appeal and a summary statement of the facts supporting such grounds." ECF No. 20-9 at 1. The tone Brown strikes in his three-page appeal letter addressed to Porter and "who it may concern" is angry and volatile, with multiple personal insults directed towards Porter. *Id.* at 2–4; *see also supra* note 6 and accompanying text.

The appeal letter was one factor contributing to Johnson's conclusion that Brown "was a threat to the Norfolk State University community." ECF No. 20-5. In upholding the expulsion decision, Johnson explains she considered a variety of factors: (1) Brown "threatened to break his roommate's jaw"; (2) in a previous case before the Dean of Students, Brown had "punched someone in the face"; (3) Brown's appeal letter, specifically "the language and content of the letter"; and (4) Brown's "volatile" behavior. *Id.* Based on all the above, Johnson explained she "did not want to compromise the safety of the student body." *Id.*

A reasonable school official addressing Brown's appeal could consider the language in Brown's appeal letter, along with the other factors listed in the appeal rationale, without violating any of Brown's clearly established free speech rights. Such consideration is necessary "to protect students and to support their educational mission." *See GMU*, 132 F. Supp. 3d at 729–30 (citing

15

*Tinker*, 393 U.S. at 513).  Accordingly, Johnson and Porter are entitled to qualified immunity from Brown's claim that they violated his First Amendment right by relying, in part, on the language in his appeal letter to uphold his expulsion.  Defendants' motion to dismiss the portion of count II premised on Brown's appeal letter should be **GRANTED** on the grounds of qualified immunity.

**D.    Brown fails to state a free speech retaliation claim in the portion of count II premised upon his writing articles and speaking to members of the NSU community.**

Brown asserts a free speech retaliation claim against defendants Porter and Johnson for "flippantly expelling him" and denying his appeal in part because he published one or more articles and spoke publicly about unsatisfactory conditions at NSU.  Am. Compl. ¶ 110.

Brown alleges "[u]pon information and belief," that he "wrote one or more articles available to the university community that brought to light one or more problems he saw with NSU and/or its officials." *Id.* ¶ 170.  Additionally, Brown alleges, "[u]pon information and belief," he also "spoke to other members of the [NSU] community about one or more problems he saw with NSU and/or its officials." *Id.* ¶ 171.  Brown asserts defendants expelled him and denied his appeal, in part, in retaliation for these constitutionally-protected acts of speech. *Id.* ¶¶ 172–73.  For both the articles and conversations, Brown alleges, "[u]pon information and belief," that "evidence . . . exists within the possession and control" of defendants and is only available to him through discovery. *Id.* ¶ 174.

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "Showing" the pleader is entitled to relief entails doing more than making a "blanket assertion." *Twombly*, 550 U.S. at 555 n.3 ("Rule 8(a) 'contemplates the statement of circumstances, occurrences and events in support of the claim presented' and does not authorize a pleader's 'bare averment that he wants relief and is entitled to it.'" (quoting 5 Wright & Miller

16

§ 1202, at 94–95)).[12]   Accordingly, "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Id.*  Pleading "upon information and belief" "signal[s] that the allegations . . . are tenuous at best," and is only permitted under Rule 8(a) where the plaintiff is "rely[ing] on second-hand information to make a good-faith allegation of fact." *Raub v. Bowen*, 960 F. Supp. 2d 602, 615 (E.D. Va. 2013).  Additionally, to plead "upon information and belief," a plaintiff must generally be "in a position of uncertainty because the necessary evidence is controlled by the defendant." *Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015).

Brown's pleadings fall short of the Rule 8(a)(2) and *Twombly* minimum pleading standards.  If Brown authored the articles and initiated conversations to bring to light problems at NSU, he should be able to provide some factual support—the subject matter addressed, approximately when and where articles were published or conversations took place, and who took part in the conversations.  Brown alleges that he possesses only a vague idea that the acts of speech addressed "problems he saw with NSU and/or its officials" with no further elaboration  Am. Compl. ¶¶ 170–71.  Brown has failed to allege any speech protected by the Constitution.

Further, Brown fails to explain how any such articles or conversations played a role in his 2017 expulsion.  Porter does not refer to Brown's prior speech in any of his emails to Brown.  *See* ECF Nos. 20-1, 20-2, 20-3.   Nor does Johnson list Brown's prior speech as one of the considerations factoring into her appeal decision and rationale.  *See* ECF Nos. 20-4, 20-5.

---

[12] Brown admits that without his other two free speech claims regarding his text conversation and appeal letter, this claim would fall short of the *Twombly* pleading standards. Pl. Opp. at 15. Brown pursues this free speech claim pursuant to Rule 18(a) of the Federal Rules of Civil Procedure, which permits joinder of claims. *Id.*

Brown's conclusory allegations do not give rise to a plausible inference that defendants retaliated against him for some unspecified prior constitutional speech when expelling him from NSU and upholding that decision on appeal. *See Iqbal*, 556 U.S. at 679. Accordingly, the portion of count II premised upon "Retaliation for Prior Constitutional Speech" contained in "one or more articles" or conversations with members of the NSU community "about one or more problems" at NSU, Am. Compl. ¶¶ 170–71, should be **DISMISSED** for failure to state a claim.

E.      **Count III's claim of gender discrimination under Title IX fails to state a claim upon which relief can be granted.**

In count III, Brown asserts a gender discrimination claim under Title IX against the Commonwealth of Virginia, NSU, and the Board, alleging he was improperly expelled from NSU and denied an appeal based on his gender.[13] *Id.* ¶¶ 177–200.

NSU is a public university receiving federal funds and is subject to the requirements of Title IX. *Id.* ¶¶ 11–12, 125–26; *see also* 20 U.S.C. § 1681 (2012). Brown alleges he "was investigated and expelled from NSU for sending a text message" in a way that "denied [him] minimal due process protections" and "procedural safeguards required by the Student Disciplinary Process based in part on his gender." Am. Compl. ¶¶ 180–81, 188–89. In contrast, Brown alleges that "NSU rarely if ever investigates [or disciplines] females for sending text messages," or for any other behavior. *Id.* ¶¶ 182–85. Brown further asserts defendants would have provided him minimal due process protections and procedural safeguards, and would not have expelled him over a text message if he were female. *Id.* ¶¶ 190–95. Brown pleads all of these allegations "[u]pon

---

[13] Brown's claim against the Commonwealth of Virginia is barred because Title IX does not provide a cause of action against the Commonwealth; it only applies to "education[al] program[s] or activit[ies] receiving Federal financial assistance." 20 U.S.C. § 1681. To the extent that Brown brings his claim against NSU, he has clarified that defendant "NSU" is both the university and the Board of Visitors. Am. Compl. ¶ 12.

information and belief," explaining that "information related to gender statistics in NSU disciplinary proceedings are in Defendants' possession and control," and that he could only acquire such information through discovery. *Id.* ¶¶ 186–87.

Title IX provides, in part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. Title IX may be enforced through an "implied private right of action." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979)). The Fourth Circuit has clarified that, in analyzing a claim brought under Title IX, courts should "look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007). Under both Title VII and Title IX, "[p]roof of discriminatory intent is necessary to state a disparate treatment claim." *Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 132 F.3d 949, 961 (4th Cir. 1997), *aff'd in part, vacated in part on other grounds en banc*, 169 F.3d 820 (4th Cir. 1999); *see also Yusuf*, 35 F.3d at 715 ("[W]holly conclusory allegations [do not] suffice for purposes of Rule 12(b)(6)" for plaintiffs "attacking a university disciplinary proceedings on grounds of gender bias").

Claims "attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories"—selective enforcement and erroneous outcome. *Yusuf*, 35 F.3d at 715. In his amended complaint, Brown does not specify under which category he is proceeding. *See* Am. Compl. ¶¶ 177–200.

Brown has failed to allege a selective enforcement claim. To state a claim for selective enforcement, Brown must allege a comparator, meaning he, "as a male plaintiff[,] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated

19

more favorably by [NSU]." *John Doe 2 v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 608 (E.D. Va. 2019) (holding that, although the Fourth Circuit has not addressed whether a selective enforcement claim requires a comparator to sustain the claim, "judges in both the Eastern and Western Districts of Virginia have held that it does") (internal quotations and citation omitted). Nowhere in his amended complaint does Brown allege a specific example of a female student who had been treated more favorably during disciplinary proceedings. Instead, Brown alleges in conclusory fashion that NSU rarely investigates or disciplines female students for sending text messages or for any other reason. Am. Compl. ¶¶ 182–85. Such conclusory allegations do not meaningfully advance Brown's selective enforcement claim across "the line from conceivable to *plausible*." *GMU*, 132 F. Supp. 3d at 733.

This leaves a potential erroneous outcome claim. An erroneous outcome claim is one in which a plaintiff alleges he was innocent of the alleged misconduct and "wrongly found to have committed an offense" because of his gender. *Yusuf*, 35 F.3d at 715; *see Brzonkala*, 132 F.3d at 961–62 (interpreting a claim of disparate treatment under Title IX as falling under the erroneous outcome theory of liability). The *Yusuf* court established a two-part test to determine whether a plaintiff was subjected to gender discrimination in violation of Title IX: (1) a plaintiff must allege "particular facts sufficient to cast doubt on the accuracy of the outcome of the challenged proceeding," and (2) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *GMU*, 132 F. Supp. 3d at 732 (citing *Yusuf*, 35 F.3d at 715).

In reviewing defendants' first motion to dismiss, the Court concluded Brown had alleged numerous procedural flaws "sufficient to cast doubt on the accuracy of the outcome of his disciplinary proceeding and on the penalty imposed on him." ECF No. 14 at 37; ECF No. 19. Accordingly, Brown has sufficiently met the first *Yusuf* factor in his erroneous outcome claim.

To satisfy the second prong of the erroneous outcome test, Brown needs to allege "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding," which may include, for example, "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *GMU*, 132 F. Supp. 3d at 732.; *see Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 766 (D. Md. 2015) (quoting *Yusuf*, 35 F.3d at 715).

Brown has not alleged any circumstances suggesting he was expelled due to his gender. Brown asserts the "information related to gender statistics in NSU disciplinary proceedings are in Defendants' possession and control," and that he could only acquire such information through discovery. Am. Compl. ¶¶ 186–87. The Fourth Circuit and Federal Rules of Civil Procedure do not permit Brown to obtain discovery based on conclusory pleadings alleging NSU discriminates against males in disciplinary proceedings. *See Johnson v. Am. Towers, LLC*, 781 F.3d 693, 709 (4th Cir. 2015) ("As currently drafted, however, the complaint resembles a prohibited fishing expedition rather than a properly pleaded complaint."); *Willis v. Marchant*, No. 3:12cv843, 2013 WL 12106940, at *2 (W.D.N.C. Feb. 26, 2013) ("Litigants are not entitled to discovery fishing expeditions to determine whether a claim exists. . . . 'Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'") (quoting *Iqbal*, 596 U.S. at 678–79)).

While Brown has added paragraphs to his gender discrimination claim in the amended complaint, he has added no new factual allegations. *See* Am. Compl. ¶¶ 177–200. In his original complaint, Brown alleged, "[u]pon information and belief, NSU rarely if ever investigates or disciplines females for the conduct Brown was accused of committing." ECF No. 1-2 ¶ 130. The Court found this allegation to be conclusory and insufficient to survive a motion to dismiss. ECF

21

No. 14 at 37–42; ECF No. 19.  In his amended complaint, Brown alleges "[u]pon information and belief": (1) "NSU rarely if ever investigates females for sending text messages"; (2) "NSU rarely if ever disciplines females for sending text messages"; (3) "NSU rarely if ever investigates females"; and (4) "NSU rarely if ever disciplines females."  Am. Compl. ¶¶ 182–85.  Brown's remaining allegations are also conclusory, stating, in effect, that defendants deprived him of due process because he is male and would have afforded him due process if he were female.  *Id.* ¶¶ 188–95.

Brown has failed to allege facts in his amended complaint sufficient to establish a causal connection between the flawed outcome of his disciplinary proceedings and gender bias.  *See Yusuf*, 35 F.3d at 715 (holding "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss").  As the court in *GMU* indicated, "there are a number of possible explanations for any disparate treatment, of which gender-motivated bias is only one."  132 F. Supp. 3d at 733.  Further, "in the absence of any specific factual allegations pointing to such [gender] bias on the part of the defendants, it cannot be said that the discriminatory motive explanation is plausible rather than just conceivable."  *Id.*

Accordingly, Brown's Title IX claim, count III, against defendants NSU, the Board, and the Commonwealth of Virginia should be **DISMISSED** for failure to state a claim.

**F.**     **Count V's breach of contract claim fails to state a claim upon which relief can be granted.**

Brown brings his breach of contract claim, count V, against defendants NSU and the Board, alleging that his expulsion constituted a breach of an express or implied contract with NSU.  Am. Compl. ¶¶ 201–62.

The Court dismissed Brown's breach of contract claim in the original complaint due to

Brown's failure to provide factual support for his assertion that NSU's disciplinary procedures constitute binding contractual terms such that his expulsion from NSU resulted in a breach of contract. ECF No. 14 at 46–47; ECF No. 19. Further, the original complaint failed to provide any factual support establishing the code of student conduct creates the "mutuality of engagement" necessary to create a binding legal contract. ECF No. 14 at 47. Brown has amended his complaint to attach the 2016–2017 NSU student handbook, ECF No. 20-7, and the 2019–2020 NSU student handbook, ECF No. 20-8. He also added speculative allegations of potential contracts NSU breached by expelling him. Am. Compl. ¶¶ 202–62.

First, Brown relies on the language in the student handbook to provide the necessary mutuality of engagement between Brown and NSU necessary to form a binding contract. Brown contends that "all regulations and policies published in the Student Handbook, the University Catalog, University bulletins and other University publications . . . constitute[] binding terms of the contract between . . . Brown and NSU upon . . . Brown's acceptance of NSU's offer of admission." *Id.* ¶ 222 (internal quotation marks omitted). This assertion is based on the following language contained in the student handbook: "All students, by accepting admission to Norfolk State University, agree to abide by all regulations and policies published in the Student Handbook, the University Catalog, University bulletins and other University publications, as well as federal, state, and local laws." *Id.* ¶¶ 221–22; ECF No. 20-7 at 19; ECF No. 20-8 at 19. The student handbooks attached to the amended complaint also contain the following language, "[t]he University reserves the right to change, modify, and/or update the Student Handbook at any time and without prior notice." ECF No. 20-7 at 7; ECF No. 20-8 at 7.

"It is well settled that Virginia law requires an absolute mutuality of engagement between the parties to a contract, whereby each party is bound and each party has the right to hold the other

party to the agreement." *Doe v. Washington & Lee Univ.*, 439 F. Supp. 3d 784, 790 (W.D. Va.

2020). For this reason, "generally applicable university conduct policies, such as handbooks and

sexual assault policies, do not establish a contract under Virginia law," because "these policies

allow for unilateral revision by the university and do not bind the school." *Washington & Lee*

*Univ.*, 439 F. Supp. 3d at 792; *see also Brown v. Rectors & Visitors of Univ. of Va.*, 361 F. App'x

531, 534 (4th Cir. 2010) (holding the University of Virginia's student handbook was not an

enforceable contract); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 587–88 (E.D. Va. 2018)

(holding Marymount University's student conduct policies are not binding, enforceable contracts);

*Jackson v. Liberty Univ.*, No. 6:17cv41, 2017 WL 3326972, at *5–7 (W.D. Va. Aug. 3, 2017)

(holding Liberty University's student handbook was not a contract); *Davis v. George Mason Univ.*,

395 F. Supp. 2d 331, 337 (E.D. Va. 2005) (finding university course catalog to be an unenforceable

contract). NSU's student handbook explicitly states that NSU can modify the handbook "at any

time without prior notice." ECF No. 20-7 at 7; ECF No. 20-8 at 7. The facts in the amended

complaint and attached student handbooks do not support Brown's assertion that the student

handbook contains binding contractual terms, which were breached by NSU's expulsion decision.

Second, Brown has added language to his amended complaint asserting the following

contracts exist between himself and NSU: (1) a contract based on Brown's acceptance of NSU's

offer of admission and provision of valid consideration in the form of tuition and fees; (2) an

express or implied housing contract; (3) an express or implied employment contract due to

Brown's participation in a work study program; and (4) contractual obligations stemming from

Brown's receipt of financial aid in the form of federal loans and grants from NSU. Am. Compl.

¶¶ 203–27. These allegations are purely speculative, and are similar to the allegations in the

original complaint that were dismissed for failure to state a claim. Brown's amendments provide

no factual support for the existence of a binding contract, based on "mutuality of engagement," such that NSU's expulsion of Brown resulted in a breach of contract. *See Twombly*, 550 U.S. at 555 n.3.

Brown's breach of contract claim, count V, against defendants NSU and the Board should be **DISMISSED** for failure to state a claim.

<h3 style="text-align:center">IV.    <u>RECOMMENDATION</u></h3>

Accordingly, the Court **RECOMMENDS** the following:

(1)    Defendants' motion to dismiss Brown's free speech claim premised on his text message and appeal letter against Porter and Johnson on the grounds of qualified immunity should be **GRANTED**, and this portion of count II should be **DISMISSED WITH PREJUDICE;**

(2)    Defendants' motion to dismiss Brown's free speech claim premised on his articles and conversation against Porter and Johnson for failure to state a claim should be **GRANTED**, and this portion of count II should be **DISMISSED WITHOUT PREJUDICE;**

(3)    Defendants' motion to dismiss Brown's Title IX gender discrimination claim against the Commonwealth of Virginia for failure to state a claim should be **GRANTED**, and count III should be **DISMISSED WITH PREJUDICE** as to the Commonwealth of Virginia;

(4)    Defendants' motion to dismiss Brown's Title IX gender discrimination claim against NSU and the Board for failure to state a claim should be **GRANTED**, and count III should be **DISMISSED WITHOUT PREJUDICE** as to NSU and the Board; and

(5)    Defendants' motion to dismiss Brown's breach of contract claim against NSU and the Board for failure to state a claim should be **GRANTED**, and count V should be **DISMISSED WITHOUT PREJUDICE.**

## V.     REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.     A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
October 20, 2020

26